# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

| | |
|---|---|
| United States of America, *ex rel.* [UNDER SEAL], | Case No.: _____ |
| Relator, | **ORIGINAL COMPLAINT FOR:** **Violations of False Claims Act, 31 U.S.C. § 3729 *et seq.*** |
| v. | |
| [UNDER SEAL], | **FILED <u>IN CAMERA</u> AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2) (EXEMPT FROM ECF)** |
| Defendants. | |
| | **JURY TRIAL DEMANDED** |

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**FILED**
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS

Sep 17, 2020

OFFICE OF THE CLERK

| | |
|---|---|
| United States of America, *ex rel.* Karla Cardon, | Case No.:  20-sc-5171 TLB |
| Relator, | **ORIGINAL COMPLAINT FOR:** **Violations of False Claims Act, 31 U.S.C. § 3729** *et seq.*, |
| v. | |
| Minimal Access Surgery, Inc., John Henry Kendrick and Thomas Louie Embry | **FILED** <u>**IN CAMERA**</u> **AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** |
| Defendants. | **JURY TRIAL DEMANDED** |

<u>**RELATOR'S ORIGINAL COMPLAINT**</u>

I.    INTRODUCTION ................................................................................................ 2
II.   THE PARTIES ................................................................................................... 2
III.  JURISDICTION AND VENUE ......................................................................... 3
IV.   THE FALSE CLAIMS ACT .............................................................................. 4
V.    MEDICARE, MEDICAID AND TRICARE ...................................................... 5
VI.   THE RELATOR ................................................................................................. 6
VII.  THE DEFENDANTS .......................................................................................... 7
VIII. THE SUBMISSION OF FALSE CLAIMS ........................................................ 7
   A.   False Billing Regarding Opiate Prescriptions ........................................................ 8
   B.   False Billing for Services "Incident To" a Supervising Physician.................... 14
   C.   False Billing for Embry Assisting Kendrick in Surgery on Fridays .............................. 23
   D.   False Billing for Ultrasound Injections................................................................. 25
   E.   False Billing for Both Office Visit and Scheduled Procedure .......................... 27
   F.   False Telemedicine Billing for Non-Substantive Phone Calls with Patients by MASI LPNs, RNs and Lab Techs.................................................................................... 29
   G.   False Billing for Level 4 Evaluation and Management Office Visits................................ 32
IX.   DEFENDANTS' FALSE CLAIMS SUBMITTED TO MCOs ALSO CONSTITUTE FCA VIOLATIONS ............................................................................................................. 33
X.    CAUSES OF ACTION ....................................................................................... 37
XI.   JURY DEMAND.................................................................................................. 40

1

Relator, Karla Cardon, through her attorneys and on behalf of the United States of America ("Government"), hereby files this Original Complaint against Minimal Access Surgery, Inc., John Henry Kendrick and Thomas Louie Embry (collectively, "Defendants"). Relator alleges as follows:

## I.   INTRODUCTION

Relator, Karla Cardon brings this *qui tam* action pursuant to the federal False Claims Act. This action concerns false and fraudulent statements, reports and claims for payment that Defendants routinely and intentionally submitted to federal government programs, including Medicare, Medicaid, TRICARE, and various Medicare Advantage Organizations ("MAOs"), and Managed Care Organizations ("MCOs") (hereinafter, the "Government"). Defendants had patients covered by each of these programs and submitted fraudulent bills to each of these programs.

Defendants are liable under the False Claims Act ("FCA", 31 U.S.C. §§ 3729 *et seq*.), due to Defendants' conduct in submitting false and fraudulent records, statements, and claims for payment to Government-funded healthcare Programs.

## II.   THE PARTIES

Relator, Karla Cardon, is a citizen of Arkansas, residing in Madison County, Arkansas.

Defendant, Minimal Access Surgery, Inc. ("MASI") is an Arkansas corporation headquartered at 5230 Willow Creek Rd., Springdale, AR 72762. Its Arkansas registered agent for service is John Henry Kendrick, 5230 Willow Creek Rd., Springdale, AR 72762. John Henry Kendrick is also MASI's incorporator and president. At all times relevant to the events described in this Complaint, MASI was engaged in the business of providing medical services to individuals who were covered by Medicare, Medicaid, or other Government-supported healthcare programs. About 60% of the patient population at MASI's Springdale clinic are Medicare and Medicaid patients. About 60-70% of the patient population at Huntsville are Medicare and Medicaid patients.

Defendant, John Henry Kendrick ("Kendrick") is an individual citizen of Washington County Arkansas. He can be served at 5230 Willow Creek Rd., Springdale, AR 72762.

Defendant, Thomas Embry ("Embry") is an individual citizen of Madison County, Arkansas. He can be served at 705 Phillips Place, Huntsville, AR 72740.

The United States is named as a Plaintiff herein pursuant to the False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.*, as funds of the United States have been directly or indirectly paid to Defendants, as a result of the knowingly false claims, records and statements alleged in this Complaint that Defendants made or caused to be made.

## III.  JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a). Jurisdiction is proper over the Defendants because the Defendants can be found in, reside in, and/or have transacted business within this Court's jurisdiction, and some of the acts giving rise to Relator's claims occurred within this district.

Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c), and 31 U.S.C. § 3732(a) because the Defendants reside in or transacts business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district.

1.    Relator has direct and independent knowledge of the alleged fraud and disclosed this information to the government before filing suit, pursuant to 31 U.S.C. § 3730(e)(4)(B). Relator believes that there has been no public disclosure of these allegations and transactions such that subparagraph (e)(4) does not apply and this disclosure was not necessary. However, in the event there has been a public disclosure, Relator made a pre-complaint disclosure in order to qualify as an "original source" under subparagraph (e)(4)(B)(2). Relator has knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transactions, and voluntarily provided the information to the Government before filing a complaint.

3

2.      Relator is familiar with Defendants' fraudulent billing practices alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

## IV.    THE FALSE CLAIMS ACT

The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986). As relevant here, the FCA establishes treble damages liability for an individual or entity that: "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(l)(A); or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, *id.* § 3729(a)(l)(B).

For purposes of the False Claims Act, "knowing" and "knowingly" (A) mean that a person, with respect to information-- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1).

In addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation or each false claim.[1]

The FCA also provides for payment of a percentage of the United States' recovery to a private individual (the "Relator") who brings suit on behalf of the United States under the FCA. *See* 31 U.S.C. § 3730(d).

---

[1] FCA civil penalties are $5,500 to $11,000 for violations occurring on or after September 29, 1999 and before January 1, 2016, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes) and 64 Fed. Reg. 47099, 47103 (1999). Penalties for violations occurring after January 1, 2016 and before January 1, 2017, are $10,781 to $21,563. Penalties for violations occurring after January 1, 2017 and assessed after June 20, 2020 are between $11,665 and $23,331.

## V.      MEDICARE, MEDICAID AND TRICARE

Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq., establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the "Medicare Program" or "Medicare").

The Government provides reimbursement for Medicare claims from the Medicare Trust Funds through CMS. CMS, in turn, contracts with Medicare Administrative Contractors, formerly known as "fiscal intermediaries" (hereinafter "MACs") to review, approve, and pay Medicare bills, called "claims," received from health care providers, such as Defendants' providers. In this capacity, the MACs act on behalf of CMS.

Payments are typically made directly to health care providers, such as Defendants, rather than to the patient. This occurs when the Medicare recipient assigns his or her right to payment to the provider, such as Defendants. In that case, the provider submits its bill directly to Medicare for payment.

In order to bill the Medicare Program, a provider must submit an electronic or hard-copy claim form called a CMS-1500 form. When the CMS-1500 form is submitted, the provider certifies that the services in question were "medically indicated and necessary for the health of the patient."

On the CMS-1500 form, the provider must state, among other things, the procedure(s) for which it is billing Medicare, the identity of the patient, the provider number, and a brief narrative explaining the diagnosis and the medical necessity of the services rendered.

All healthcare providers, including Defendants' providers, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare.

A provider has a duty to have knowledge of the statutes, regulations and guidelines regarding coverage for the Medicare services, including, but not limited to, the following: (a) Medicare reimburses only reasonable and necessary medical services furnished to beneficiaries. See 42 U.S.C. § 1395y(a)(1)(A); and (b) Providers must assure that they provide economical medical services, and then, only when, and to the extent, medically necessary. See 42 U.S.C. § 1320c-5(a)(1). Medicare regulations exclude from payment services that are not reasonable and

necessary. See 42 C.F.R. § 411.15(k).

Because it would not be feasible to review medical documentation before paying each claim, the MACs generally make payment on the basis of the providers' certification on the Medicare claim form that the services in question were "medically indicated and necessary for the health of the patient." The claims are paid from the Medicare Trust Funds, funded by American taxpayers.

TRICARE, formerly known as the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), is the U.S. Department of Defense Military Health System's health care program, which provides civilian health benefits for U.S Armed Forces military personnel, military retirees, and their dependents and is managed by the U.S. Defense Health Agency. It has similar restrictions as Medicare.

Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The Government partly funds and oversees the Medicaid program through the Centers for Medicare & Medicaid Services ("CMS"), an agency within the federal Department of Health & Human Services. It has similar restrictions as Medicare.

The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding. 42 U.S.C. § 1396a. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage, is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the federal contribution is at least 50 percent, and, currently, as high as 76.98 percent. The federal contribution for the Arkansas Medicaid program is generally on the high side of this range.

## VI.   THE RELATOR

Relator has worked as a billing coder for MASI since around 2015 and is still employed by MASI.

Relator works at MASI's Huntsville facility and bills for services provided by Dr. Thomas Embry. Dr. Embry does not perform any surgeries. Relator has personally witnessed fraudulent

billing for services provided at the Huntsville facility.

Another coder, Theresa Farrar, bills for the services provided at the Springdale facility. Relator has covered for Ms. Farrar in the past and has seen that services at Springdale are billed fraudulently in the same manner as those at the Huntsville facility.

## VII.   THE DEFENDANTS

Defendant MASI has two clinics, one in Springdale, Arkansas and one in Huntsville, Arkansas. MASI's clinics provide primary care and minimally invasive surgeries and are staffed by two physicians (John Kendrick and Thomas Embry) and multiple nurse practitioners and staff.

Defendant John Kendrick owns MASI and works at both of its clinics.

Defendant Thomas Embry works at the Huntsville location and is aware that his NPI is used for fraudulent billing.

## VIII.   THE SUBMISSION OF FALSE CLAIMS

Dr. Kendrick is the one primarily engaged in the fraud and he controls the operations at both facilities.

Relator has complained about the fraudulent billing to (1) Dr. Kendrick, (2) Mary White (Office Manager at the Springdale clinic) and (3) Ms. Farrar.

Dr. Kendrick has responded to Relator's complaints by telling Relator to: "Bring it to Theresa, she'll do it." In other words, when Relator resisted participating in fraudulent billing, Dr. Kendrick had her pass the job along to Ms. Farrar to facilitate the scheme.

Mary White is Relator's supervisor and the Office Manager of the Springdale office. She is familiar with MASI's practice of charging for Level 3 Office Visits when patients call in to speak to a nurse, and she instructed Relator that this was MASI's policy. When Relator objected, White told Relator that Relator needed to comply with Dr. Kendrick's instructions and continue billing in this manner. When Relator said she believed that Medicare did not allow this type of billing, White responded, "Nobody cares about your opinion, just do as you are told."

Dr. Kendrick has told Relator to go home without pay if she does not comply with his mandates when Relator complained about the way MASI fraudulently billed for telemedicine

appointments.

Defendants' fraudulent billing falls into the following categories:

    A.    False Billing Regarding Opiate Prescriptions

    B.    False Billing for Services "Incident To" a Supervising Physician

    C.    False Billing for Embry Assisting Kendrick in Surgery on Fridays

    D.    False Billing for Ultrasound Injections

    E.    False Billing for Both Office Visit and Scheduled Procedure

    F.    False Telemedicine Billing for Non-Substantive Phone Calls with Patients by MASI LPNs, RNs and Lab Techs

    G.    False Billing for Level 4 Evaluation and Management Office Visits

Several examples of these types of false billing are listed below. Patients are identified by number rather than name, in order to protect the patients' privacy. Patients will be identified separately and privately to Defendants and the Court.

**A.    False Billing Regarding Opiate Prescriptions**

Dr. Kendrick designed and executed a fraud scheme to maximize profits involving improperly prescribing opioid drugs.

From at least 2018 through 2020 ("the relevant time period"), in violation of the FCA, Defendants submitted, caused to be submitted, and conspired to submit and cause the submission of a substantial number of false claims to federal health care programs, including the Medicare, Medicaid, and the TRICARE programs by billing or causing to be billed to federal health care programs claims for prescriptions for opioid and lidocaine medications that were not medically necessary or were without a legitimate medical purpose.

In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D. An individual is eligible to enroll in Part D if the individual lives in the service area of the Part D plan and is entitled to

Medicare benefits under Part A or enrolled under Part B. 42 U.S.C. § 1395w-101(a)(3)(A); 42 C.F.R. § 423.30(a).

Unlike coverage in Medicare Part B, Part D coverage is not provided within the traditional Medicare program. Medicare Part D is based on a private market model. Medicare contracts with private entities known as Part D Plan "Sponsors" to administer prescription drug plans. A Part D Plan Sponsor may be either a prescription drug plan, a Medicare Advantage organization that offers a Medicare Advantage prescription drug plan, a Program of All-inclusive Care for the Elderly ("PACE") organization offering a PACE plan including qualified prescription drug coverage, or a cost plan offering qualified prescription drug coverage. 42 C.F.R. § 423.4.

Medicare beneficiaries who wish to receive Part D benefits must enroll in a Part D Plan offered by a Part D Plan Sponsor. The Part D Sponsors are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts. Part D Sponsors, in turn, enter into subcontracts with pharmacies or other downstream entities to provide prescription drugs to the Medicare Part D beneficiaries enrolled in their plans.

Generally, after a physician writes a prescription for a Medicare Part D beneficiary, that patient can take the prescription to a pharmacy (or submit it to a mail order specialty pharmacy) to be filled.

When a pharmacy dispenses a drug to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D Plan Sponsor (sometimes through a pharmacy benefit manager ("PBM")) and receives reimbursement from the Part D Plan Sponsor (or the PBM) for the portion of the drug cost not paid by the Part D beneficiary.

The Part D Plan Sponsor then notifies CMS that a drug has been purchased and dispensed through a document called a Prescription Drug Event ("PDE") record, which includes data elements about the drug dispensed, the prescription, and the payment to the pharmacy.

Each PDE that is submitted to CMS is a summary record that documents the final adjudication of a dispensing event based upon claims received from pharmacies and serves as the

request for payment for each individual prescription submitted to Medicare under the Part D program. The data contained in PDEs are data related to payment of claims. The Integrated Data Repository process date is the date when the PDE is transmitted to CMS, such that CMS is informed of the PDE by the Part D Plan Sponsor.

Submitting PDE claims data to CMS, which is necessary for CMS to administer the Part D program and make payments to Part D Plan Sponsors for qualified drug coverage, is a material condition of payment for CMS's provision of Medicare funds to Part D Plan Sponsors. *See* 42 C.F.R. § 423.322.

Throughout the year, CMS makes prospective payments to Part D Plan Sponsors for three subsidies based on the Sponsors' approved bids: (1) the direct subsidy designed to cover the Sponsor's cost of providing the benefits; (2) the low-income cost-sharing subsidy; and (3) the reinsurance subsidy.

The direct subsidy (a monthly capitated payment) is paid to the Part D Plan Sponsor "in the form of advance monthly payments equal to the Part D Plan's standardized bid, risk adjusted for health status as provided in 42 C.F.R. § 423.329(b), minus the monthly beneficiary premium as determined in 42 C.F.R § 423.286." 42 C.F.R. § 423.315(b). In other words, CMS pays a monthly sum to the Part D Plan Sponsor for each Part D beneficiary enrolled in the plan.

CMS also makes payments to the Part D Plan Sponsor for premium and cost sharing subsidies on behalf of certain subsidy-eligible individuals as provided in 42 C.F.R. § 423.780 and 42 C.F.R. § 423.782. Cost-sharing subsidies for qualifying low-income individuals are called "Low-Income Cost Sharing Subsidies" and are documented and reconciled using PDE data submitted to CMS.

Part D sponsors who fail to submit required claims-level information contained in the PDE to CMS risk having to return the monthly payments to CMS during reconciliation. *See* 42 C.F.R. §§ 423.343(b), (c)(2) and (d)(2). In addition, Part D Sponsors are responsible for correcting submitted PDE data they determine are erroneous.

After the close of the plan year, CMS is responsible for reconciling the prospective payments to the Part D Sponsor's actual allowable costs by relying upon data elements submitted by Sponsors in their PDE records.

In order to receive Part D funds from CMS, Part D Plan Sponsors, their authorized agents, employees, and contractors are required to comply with all applicable federal laws and regulations, as well as CMS instructions. By statute, all contracts between a Part D Plan Sponsor and HHS must include a provision whereby the Part D Plan Sponsor agrees to comply with the applicable requirements and standards of the Part D program, as well as the terms and conditions of payment governing the Part D program. 42 U.S.C. § 1395w-112. Further, CMS regulations expressly require Part D Plan Sponsors to certify, in their contracts with CMS, that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including the False Claims Act and AKS. *See* 42 C.F.R. § 423.505(h)(1).

CMS regulations require that all subcontracts between Part D Plan Sponsors and downstream entities, including pharmacies, contain language obligating the dispensing pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(4)(iv).

Medicare Part D only pays for drugs that are used for a medically accepted indication, which means a use that is approved under the Food, Drug, and Cosmetic Act, or a use which is supported by one or more citations included or approved for inclusion in one of the specified compendia. 42 U.S.C. § 1395w-102(e)(1) & (e)(4); 42 U.S.C. § 1396r-8(g)(1)(B)(i)& (k)(6); 42 C.F.R. § 423.100.

Medicare Part D only pays for drugs that are dispensed upon a valid prescription. 42 U.S.C. § 1395w-102(e); 42 C.F.R. § 423.100. A "Part D sponsor may only provide benefits for Part D drugs that require a prescription if those drugs are dispensed upon a valid prescription." 42 C.F.R. § 423.104(h). A valid prescription must comply "with all applicable State law requirements constituting a valid prescription." 42 C.F.R. § 423.100.

Moreover, prescriptions for controlled substances that are not issued for a legitimate medical purpose, such as recreational use, are not for "medically accepted indications" and are therefore not covered Medicare Part D drugs. 42 USCA § 1395w-102(e)(1); 42 C.F.R. § 423.100.

All prescriptions for controlled substances are required to be dated as of, and signed on, the day when issued and to bear the full name and address of the patient; the drug name; strength; dosage form; quantity prescribed; directions for use; and the name, address, and registration number of the practitioner. 21 C.F.R. § 1306.05(a).

7Part D plans may also exclude drugs from payment if the drugs are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve functioning of a malformed body part. 42 U.S.C. § 1395w-102(e)(3) (incorporating by reference 42 U.S.C. § 1395y(a))

During the relevant time period, MASI staff wrote prescriptions for opioid medications for Part D beneficiaries that were filled by pharmacies and paid for by Medicare. MASI submitted or caused the submission of medically unnecessary claims to those federal health care programs for prescription drugs, including opioids, that were medically unnecessary and unreasonable and lacked a legitimate medical purpose. Defendants submitted, or caused the submission of, these claims with knowledge that they were medically unnecessary—or at least in reckless disregard of that fact.

In many instances, MASI issued opioid prescriptions to patients without actually seeing the patients and/or without properly assessing the patients' need for those drugs.

MASI employees used pre-signed and forged opioid prescriptions with patients when the patient's provider was not present. For example, Dr. Kendrick provided MASI staff with pre-signed prescription forms, enabling the staff members to simply write in the opioid drug name and dosage when Dr. Kendrick was not present in the office or was otherwise unavailable to see the patient. In other instances, MASI staff simply forged Dr. Kendrick's signature on opioid prescriptions.

12

MASI's APRNs, including Gina Dickey, improperly prescribed Schedule II opiates. In Arkansas, APRNs ability to prescribe Schedule II opiates is limited. THE APRN must have a collaborating physician in the same scope, specialty, or practice area as the APRN. There must be a collaborative practice agreement that includes a quality assurance plan and prescriptive protocols and the APRN must have attended an approved pharmacology course, and can only prescribe within the scope of practice of her certification and experience. Prescribing schedule II drugs is limited to hydrocodone-combination products specified in the collaborative practice agreement. Prescribers are legally required to consult the PDMP before prescribing opioids. Prescribing controlled substances requires a minimum of 2 continuing education hours about controlled substances, physician evaluation of any patient treated with controlled substances for chronic nonmalignant pain every 6 months, and a signed pain contract with the patient.

MASI's APRNs did not meet these qualifications, so they just forged Dr. Kendrick's or Dr. Embry's name when prescribing opiates, pursuant to MASI policy directed by Dr. Kendrick. MASI frequently billed for prescribing Schedule II controlled substances for patients where no physician ever assessed the patients and MASI staff improperly used Dr. Kendrick's or Dr. Embry's signature.

For example, **Patient 21** obtained a prescription from MASI for hydrocodone, a Schedule II controlled substance, from Dr. Embry on 3/30/20 and 4/30/20, despite the fact that Dr. Embry was not in the office, and never saw that patient. In reality APRN Gina Dickey prescribed the drugs and forged Dr. Embry's name. Medicare Part D paid for this forged/pre-signed prescription.

As another example, **Patient 25** obtained six prescriptions from MASI on 3/9/20 after seeing Marie Hatfield. The prescriptions had Dr. Kendrick's forged signature, although he was not in the office, and never saw that patient. In reality Nurse Marie Hatfield prescribed the drugs and forged Dr. Kendrick's name. Medicare Part D paid for this forged/pre-signed prescription.

As another example, **Patient 26** obtained a prescription for hydrocodone, a Schedule II controlled substance, from Dr. Embry on 3/30/20 and 4/30/20, despite the fact that Dr. Embry was

not in the office, and never saw that patient. In reality APRN Gina Dickey prescribed the drugs and forged Dr. Embry's name. Medicare Part D paid for this forged/pre-signed prescription.

As another example, **Patient 29** obtained a prescription for hydrocodone, a Schedule II controlled substance, despite the fact that APRN Gina Dickey was the only person who saw the patient.

As another example, **Patient 71** obtained a prescription for oxycodone, a Schedule II controlled substance, from MASI on 1/16/20, despite the fact that Dr. Embry was not in the office, and never saw that patient. In reality APRN Gina Dickey prescribed the drugs and forged Dr. Embry's name. Medicare Part D paid for this forged/pre-signed prescription.

**Patient 116** and **Patient 117** were prescribed opiates in August or September 2020 by Dr. Kendrick at MASI despite the fact that Dr. Kendrick knew another doctor was simultaneously prescribing opiates to these patients. Dr. Kendrick has his nurses use the Arkansas Prescription Drug Monitoring Program, an electronic database of controlled substances dispensed to patients in Arkansas. One purpose of this program is to ensure that patients in Arkansas are not overprescribed dangerous opiates by getting opiate prescriptions simultaneously from multiple doctors. Despite knowing that these patients were already being prescribed opiates from another doctor, Dr. Kendrick prescribed them additional opiates.

Dr. Kendrick knew about the conduct described above, but nevertheless permitted his employees to continue writing these improper opioid medication prescriptions, including prescriptions that would be reimbursed by Medicare, Medicaid, and TRICARE.

Dr. Kendrick did not take appropriate or sufficient steps to curb the prescription of medically unnecessary and illegitimate opioids at MASI. Instead, Dr. Kendrick himself profited from these prescribing practices.

### B.      False Billing for Services "Incident To" a Supervising Physician

Medicare pays 85 percent of the physician fee schedule (PFS) rate when a service is billed under an NP's or PA's own NPI, but Medicare pays 100 percent of the PFS rate when the same

service provided by an NP or PA is billed "incident to" a supervising physician.

A bill for a service that is provided "incident to" a supervising physician is indistinguishable from a bill for a service provided directly by the physician. The physician's NPI is entered on the claim, and there is no indication whether the service was provided by an NP or PA and billed "incident to" or provided directly by the physician. Thus, when a service is billed "incident to," Medicare cannot know who actually delivered care to the beneficiary.

Medicare only permits "incident to" billing for certain patients in non-institutional settings. For example, physician office services provided by NPs and PAs to new patients in physician offices cannot be billed as "incident to" by a supervising physician; rather, they must be billed directly by the NP or PA, using their own NPI.

Additionally, Medicare prohibits "incident to" billing for any services performed in institutional settings, such as hospital outpatient departments (HOPDs), and nursing homes.

"Incident to" billing, as defined by federal legislation, refers to the provider billing of services and supplies that are performed by auxiliary personnel. Medicare defines a provider to include nurse practitioners (NPs) and physician assistants (PAs).

The provider must first see the patient and develop a plan of care and initiate the course of treatment. The "incident to" service provided by the auxiliary personnel is then an incidental part of the patient's treatment. The patient can see the auxiliary personnel for continued treatment of the initial problem that was presented to the provider. If a new problem is identified at a visit by the auxiliary personnel, the patient must be referred back to the provider for evaluation and development of a new plan of care. The provider must demonstrate an active participation in the ongoing care of the patient, such as providing services on a regular basis that reflects participation on an ongoing basis. Reimbursement is based on 100% of the provider's fee schedule amount.

Certain requirements must be met to bill "incident to":

a)      The services are an integral, although incidental, part of the provider's professional service.

15

b)      The services are of a type commonly furnished in provider's offices or clinics.

c)      The services are furnished under the provider's direct personal supervision and are furnished by the provider or by an individual who is an employee or independent contractor of the physician. Direct supervision does not require the provider's presence in the same room but the provider must be immediately available.

d)      The provider must perform "the initial service and subsequent services of a frequency which reflect his or her active participation in the management of the course of treatment."

e)      The provider under whose name and number the bill is submitted must be the individual present in the office suite when the service is provided.

f)      The documentation in the patient chart must match the service that was billed.

The incident-to rules are stated in the Medicare Carriers Manual (Part 3, Chapter II, section 2050), available online at https://www.cms.gov/manuals/Downloads/bp102c15.pdf.

Defendants routinely billed under false provider numbers; falsely billed for NP "incident to" billing; and permitted nurse practitioners to practice without proper physician oversight - all to fraudulently maximize the reimbursement received from federal health care programs.

These nurse practitioners, who lack specialized credentials, are always or almost always tasked with providing patient care, including performing procedures without proper and adequate physician oversight, thereby making all billing for these services fraudulent.

Indeed, even if the nurse practitioners were merely carrying out a physician's instructions for each patient with particularity (i.e., not exercising their own unsupervised medical judgment), the services provided by the nurse practitioners could not be reasonable or justified for reimbursement because a physician's orders were not based upon actual examinations and individualized medical assessments.

These nurse practitioner services are often being billed as "incident to" Doctors John Kendrick and Thomas Embry, under the doctors' provider numbers in order to justify a false, higher reimbursement rate.

From at least 2017 through 2020, Dr. Kendrick sent NPs (including Tammie Smith and Marie Hatfield) to provide services in nursing homes (including Edgewood Health & Rehabilitation Center (also known as Walnut Grove Health & Rehabilitation Center) in Springdale; and Springhouse Village Assisted Living, Fayetteville Health and Rehabilitation Center, and Brookstone Assisted Living Community in Fayetteville).

These services were billed under Dr. Kendrick's NPI even though they did not meet the "incident to" requirements for multiple reasons including:

      a)     The services were not furnished under Dr. Kendrick's direct personal supervision, and were furnished in an off-site nursing home where Dr. Kendrick was not immediately available;

      b)     Dr. Kendrick did not perform the initial service for the nursing home patient; not did he perform subsequent services of a frequency which reflect his active participation in the management of the course of treatment; and

      c)     Dr. Kendrick, under whose name and NPI number the bill was submitted, was not present in the office suite when the service is provided.

Once the NPs finish documenting the visit and close the visit, Dr. Kendrick's electronic signature is automatically added without Dr. Kendrick ever seeing the patient or reviewing the records.

Theresa Farrar submitted the false billing for services provided by NPs under Dr. Kendrick's NPI. Reviewing Dr. Kendrick's office schedule will demonstrate that Dr. Kendrick was seeing patients at one of MASI's clinics and could not have been present at the nursing homes, or immediately available to the NPs visiting patients at the nursing homes.

Additionally, each patient's records will demonstrate that Dr. Kendrick did not perform the

initial service for the nursing home patient and did not perform subsequent services of a frequency that reflect his active participation in the management of the course of the patient's treatment.

Accordingly, the bills submitted by Farrar for Kendrick's services provided at nursing homes are false because they certify that NP services billed under Kendrick's NPI meet the "incident to" billing requirements.

In order to permit an NP to bill under Dr. Kendrick's NPI, Dr. Kendrick is required to participate in the initial patient visit, to participate in patient visits when existing patients have a new medical condition, and to participate at least every three months.

However, MASI's NPs routinely saw patients from start to finish, with no participation of Dr. Kendrick, and MASI illegally billed the NP's services under Dr. Kendrick's NPI (or Dr. Embry's NPI) in order to get the 15% higher reimbursement rate.

Additionally, Dr. Kendrick is a specialist, so the patient's co-pay is higher for his visits. Patients complained about paying a higher co-pay for Dr. Kendrick when they never saw the doctor and only saw a PA. In these situations, Relator was instructed to bill these patients under Dr. Embry, who is not a specialist, so the patient would not notice the difference, but MASI would still receive the higher reimbursement rate.

Examples of this false billing for nurses visiting patients at nursing homes and assisted living centers include the following:

**Patient 115**. On 2/25/20 this resident of Springhouse Village nursing home in Fayetteville had a nursing home visit from MASI nurse Marie Hatfield. MASI billed the visit under Dr. Embry's NPI, using CPT code 99336, even though Dr. Embry was at the Huntsville clinic seeing patients all day and did not see this patient, nor was he available to supervise Hatfield. Medicare paid the claim.

**Patient 52**. On 9/10/19, MASI nurse Marie Hatfield had a new patient visit with this patient at Fayetteville Health and Rehabilitation Center, nursing home. MASI billed the visit under Dr. Kendrick's NPI and had Dr. Kendrick sign the medical record even though Dr. Kendrick never

saw that patient and was not available to supervise Nurse Hatfield during the visit. Medicaid paid the claim.

**Patient 53**. On 3/12/20 this patient had a new patient nursing home visit with a MASI nurse. MASI billed the visit under Dr. Kendrick's NPI even though Dr. Kendrick was on vacation that day and unavailable to supervise the nurse. Medicare was charged $197.00 and paid $99.47 for the visit.

**Patient 54**. On 3/5/20 this patient had a nursing home visit at Fayetteville Health and Rehabilitation Center, nursing home, in which MASI billed for a new patient nursing home visit under Dr. Kendrick's NPI using CPT code 99305, even though Dr. Kendrick was seeing patients at the Huntsville clinic all day (as evidenced by his schedule.) Medicare was charged $197.00 and paid $98.47 for this visit.

**Patient 55.** – MASI billed under Dr. Kendrick's NPI for multiple visits at Fayetteville Health and Rehabilitation Center, nursing home, with this patient even though the patient was always seen by nurse Marie Hatfield, with Dr. Kendrick unavailable to supervise because he was working at the Huntsville clinic. These visits include visits on 10/1/19, 9/13/19, 9/6/19, 9/2/19, 8/29/19, 8/28/19, and 8/16/19. Medicare and Medicaid paid for these visits. On 12/5/19 the patient had a sick visit from Nurse Hatfield at this nursing home, which was billed under Dr. Kendrick's NPI. Dr. Kendrick's schedule for 12/5/19 shows he was seeing patients at the Huntsville clinic and could not have been at the nursing home. This visit was wrongfully billed under Dr. Kendrick's NPI to Medicare and Medicaid using CPT codes 99309, 20610 (drain/inj joint/bursa w/o us) and J1040 (Methylprednisolone 80 mg inj). Medicare and Medicaid were charged $341.00. Medicare paid $104.37 and Medicaid paid $30.95 for this nursing home visit in which the patient saw a nurse and not Dr. Kendrick.

**Patient 56**. On 1/30/20 Nurse Hatfield had a new patient visit with this patient at Fayetteville Health and Rehabilitation Center, nursing home. MASI billed under Dr. Kendrick's NPI using CPT code 99305 even though Kendrick was seeing patients in the Huntsville clinic all

day. MASI charged Medicare $197.00 for the visit.

**Patient 57.** –On 12/5/19 Nurse Hatfield had a new patient visit with this patient at a nursing home. MASI billed under Dr. Kendrick's NPI using CPT code 99309 even though Kendrick was seeing patients in the Huntsville clinic all day. Dr. Kendrick's schedule for 12/5/19 shows he was seeing patients at the Huntsville clinic all day and could not have been at the nursing home. The medical record was signed by Dr. Kendrick. Medicare was charged $163.00 and paid $69.41 for this nursing home visit in which the patient saw a nurse and not Dr. Kendrick.

**Patient 58.** On 10/14/19 Nurse Hatfield had a new patient visit with this patient at Brookstone Assisted Living Community in Fayetteville. MASI billed under Dr. Kendrick's NPI using CPT code 99326 (domicil/r-home visit new pat) even though Kendrick was seeing patients in the Huntsville clinic all day. Medicare was charged $210.00 and paid $106.45 for this new patient appointment in which the patient saw a nurse and not Dr. Kendrick.

**Patient 59.** On 1/9/20 Nurse Hatfield had a new patient visit with this patient at a nursing home. MASI billed under Dr. Kendrick's NPI to Medicare and Arkansas BCBS using CPT code 99326 even though Kendrick was seeing patients in the Huntsville clinic all day. Medicare and AR BCBS were charged $210.00 for this new patient nursing home visit.

**Patient 60**. On 2/13/20 Nurse Hatfield had a new patient visit with this patient at Fayetteville Health and Rehabilitation Center, nursing home. MASI billed under Dr. Kendrick's NPI using CPT code 99305 even though Kendrick was seeing patients in the Huntsville clinic all day. MASI charged Medicare, which paid $123.53.

**Patient 61.** On 12/5/19 the patient was seen by Marie Hatfield in a nursing home but the visit was billed under Dr. Kendrick's NPI. The Medical Record indicates the visit is a sick visit and appears to be signed by Dr. Kendrick, even though Dr. Kendrick was at the Huntsville clinic seeing patients all day and could not have been at the nursing home, as evidenced by Dr. Kendrick's schedule. This visit was wrongfully billed under Dr. Kendrick's NPI to Medicare and AR BCBS using CPT code 99308. Medicare and AR BCBS were charged $102.00 for the visit.

Medicare paid $52.19 and AR BCBS paid $13.09. Two weeks later, on 12/19/19 the patient was again seen by Marie Hatfield in a nursing home and the visit was billed under Dr. Kendrick's NPI. The Medical Record from the nursing home appears to be signed by Dr. Kendrick. The Appointment List for 12/12/19 shows Dr. Kendrick was seeing patients in the Huntsville clinic all day and therefore did not see this patient in the nursing home. This visit was wrongfully billed under Dr. Kendrick's NPI to Medicare and AR BCBS using CPT code 99309. Medicare and AR BCBS were charged $163.00 for this visit. Medicare paid $69.41 and AR BCBS paid $17.41.

**Patient 62.** There are several examples of nursing home visits for this patient in which the patient saw Marie Hatfield but the visits were billed under Dr. Kendrick's NPI, even though Kendrick was not present and not available to supervise. These include: 11/21/19 (CPT code 99309; Medicare paid $69.41 and Medicaid paid $17.41); 12/26/19 (CPT code 99308; Medicare and Medicaid paid $65.46); and 1/23/20 (CPT code 99309; Medicare paid $68.92 and Medicaid paid $17.29).

**Patient 63.** On 2/4/20 the patient was seen by Marie Hatfield at Edgewood Health and Rehabilitation Center in Springdale, Arkansas, but the visit was billed under Dr. Kendrick's NPI, CPT code 99309, to Medicare and AR BCBS. Dr. Kendrick was seeing patients in Huntsville all day and was not at the nursing home, as evidenced by his calendar. Medicare and AR BCBS were charged $163.00 and paid $86.46 for this claim.

**Patient 64.** On 11/14/19 and 1/23/20 the patient had nursing home visits in which the patient saw Marie Hatfield but the visit was billed under Dr. Kendrick's or Dr. Embry's NPI. For the first visit (billed under CPT code 99308) Medicare and Tricare were charged $102.00, and Medicare paid $52.19 and Tricare paid $13.09. For the second visit (billed under CPT code 99309) Medicare and Tricare were charged $163.00, and Medicare paid $68.92 and Tricare paid $17.29. On both visits, the patient saw only Nurse Hatfield and not a physician, and no MASI physician was present or available to supervise Nurse Hatfield.

**Patient 65.** On 2/18/20 Nurse Hatfield saw this new patient at Brookstone Asssisted Living

Community nursing home in Fayetteville, but MASI billed for the visit under Dr. Kendrick's NPI, CPT code 99326. The patient was a "new admit to the facility on memory unit" and the medical record was signed by Dr. Kendrick, even though he was seeing patients all day at the Huntsville clinic and could not have been at the nursing home, as evidenced by his appointment list for that day. Medicare was charged $210.00 and paid $105.78 for this visit.

**Patient 66**. On 12/19/19 Nurse Marie Hatfield saw this new patient at Brookstone Asssisted Living Community. MASI billed Medicare and Tricare using CPT code 99326 for the visit under Dr. Kendrick's NPI, but Dr. Kendrick was in the Huntsville clinic that day. Medicare and Tricare were charged $210.00 for this appointment. Medicare paid $106.45 and Tricare is believed to have paid $26.70 for this visit.

**Patient 67.** On 12/19/19 Nurse Marie Hatfield saw this new patient at Springhouse Village Assisted Living. MASI billed Medicare using CPT code 99326 for the visit under Dr. Kendrick's NPI, but Dr. Kendrick was in the Huntsville clinic that day.

**Patient 68.** On 12/5/19 Nurse Marie Hatfield saw this new patient at Edgewood Health & Rehabilitation Center. MASI billed Medicare using CPT code 99305 for the visit under Dr. Kendrick's NPI, but Dr. Kendrick was in the Huntsville clinic that day. The patient is listed on the Daily Activities Report for 12/5/19, which shows various patients listed above as also having nursing home visits that day, when Dr. Kendrick was seeing patients at the Huntsville clinic the entire day. The Impression/Diagnosis section of the patient's record notes: "Patient was seen in office today and diagnosis are current as of: 12-05-2019" however the patient was seen at Edgewood Health and Rehabilitation Center in Springdale, Arkansas. The medical record was signed by Dr. Kendrick, who never saw the patient and did not supervise Nurse Hatfield's visit with the patient. This visit was wrongfully billed under Dr. Kendrick's NPI to Medicare and AR BCBS using CPT code 99305. Medicare and AR BCBS were charged $197.00 for this appointment. Medicare paid $99.23 and AR BCBS paid $24.89.

**Patients 69 and 70** are additional examples of improper billing under a MASI doctor's

NPI when a MASI nurse visits a patient in a nursing home.

### C.  False Billing for Embry Assisting Kendrick in Surgery on Fridays

Dr. Kendrick performs minimal surgeries in the two MASI clinics and at Washington Regional Medical Center Hospital in Fayetteville. MASI bills for the surgeries in the clinics as well as the surgeries in the hospital.

Nurse practitioners (primarily Marie Hatfield, an Advanced Practice Registered Nurse) assist Dr. Kendrick with the surgeries but MASI bills as if Dr. Embry had assisted him. This is because non-physicians assisting in surgeries must bill with an "AS" modifier appended, and the Government pays twice as much when a physician rather than a non-physician assists in a surgery.

Rather than billing under Nurse Marie Hatfield's NPI with an AS modifier appended, MASI billed under Dr. Embry's NPI, as if Dr. Embry was assisting in the surgery. This false billing resulted in MASI improperly receiving the higher rate the Government pays when a physician, rather than a non-physician, assists in a surgery. Because the pay rate for physicians assisting in surgery is double the amount for non-physicians, MASI was paid twice as much as it should have been by falsely stating that Dr. Embry, rather than Nurse Hatfield, assisted Dr. Kendrick in the surgeries.

Dr. Kendrick performs the surgeries at Washington Regional Medical Center Hospital in Fayetteville on Fridays and bills as if Dr. Embry was assisting him in those surgeries. However, Dr. Embry works at MASI's Huntsville clinic on Fridays. Dr. Embry's office schedule from MASI's Huntsville clinic on Fridays demonstrates that he could not possibly have been assisting Dr. Kendrick at Washington Regional Medical Center Hospital in Fayetteville. Some examples are listed below.

**Patient 1** was operated on by Dr. Kendrick on Friday, 4/21/17. MASI billed for Dr. Embry assisting in the surgery, but actually Marie Hatfield was the one who assisted in the surgery. Medicare and Medicaid were charged $1600.00 and paid $138.21 for the assistant surgeon charge billed by Dr. Embry when the assistant surgeon was actually Marie Hatfield.

23

**Patient 2** was operated on by Dr. Kendrick on Friday, 3/17/17. MASI billed for Dr. Embry assisting in the surgery, but actually Marie Hatfield was the one who assisted in the surgery. The operative report for the 3/17/17 procedure indicates Dr. Kendrick performed a laparoscopic cholecystectomy with cystic duct cholangiogram on the patient and was assisted by Marie Hatfield. MASI falsely billed Medicare as if Dr. Embry assisted in the surgery, and was paid $106.92.

 **Patient 3** was operated on by Dr. Kendrick on Friday, 6/21/19. MASI billed for Dr. Embry assisting in the surgery, but actually Marie Hatfield was the one who assisted in the surgery. Dr. Kendrick performed a laparotomy with retroperitoneal node removal and release of small bowel volvulus on the patient. The operative report notes the assistant was Marie Hatfield and not Dr. Embry. Medicare and Medipak were charged $2200.00 and paid $374.83 according to the claims form when Dr. Embry was not the assistant surgeon and it was instead Marie Hatfield.

 **Patient 4** was operated on by Dr. Kendrick on Friday, 7/5/19. MASI billed for Dr. Embry assisting in the surgery, but actually Marie Hatfield was the one who assisted in the surgery. The claims information screen shows Marie Hatfield is billing under Dr. Embry's name. The operative report dated 7/5/19 notes Dr. Kendrick performed a laparotomy with repair of incarcerated ventral hernia x 3. There is no assistant surgeon listed on the operative report. Dr. Embry's schedule for 7/5/19 indicates he was on vacation from 7/2-7/14. The Health Insurance Claims Form notes on 7/5/19 Dr. Embry billed CPT codes 49566 (rerepair ventrl hern block) (with Modifier 82) and 49568 (hernia repair w/mesh) (with Modifier 82) to Medicare. Medicare was charged $2100.00 and paid $145.14 when Dr. Embry was on vacation and there is no assistant surgeon even listed on the operative report.

 **Patient 5** was operated on by Dr. Kendrick on Friday, 4/6/18. MASI billed for Dr. Embry assisting in the surgery, but actually Marie Hatfield was the one who assisted in the surgery. The daily activity report shows that an assistant surgeon was billed with Modifier 82, meaning it should have been a doctor and not Marie Hatfield. Medicare and Medicaid were charged $1500.00 and paid $108.71 for Dr. Embry's services when Marie Hatfield was assisting in the surgery and not

Dr. Embry.

**Patient 6** had an operation on Wednesday, 4/11/18 and MASI billed for Dr. Embry serving as an assistant surgeon. Per his schedule, Dr. Embry was in Huntsville seeing patients all day and could not have assisted on this surgery. On 5/8/18 Medicare made a payment of $84.43 for this claim.

**Patient 7** had an operation on Friday, 9/6/19 and MASI billed for Dr. Embry serving as an assistant surgeon. Per his schedule, Dr. Embry was in Huntsville seeing patients all day and could not have assisted on this surgery. On 9/26/19 Medicare paid $88.08 and on 10/22/19 Medicaid paid $21.63 for this claim.

**Patient 8** had an operation on Friday, 3/8/19 and MASI billed for Dr. Embry serving as an assistant surgeon. Per his schedule, Dr. Embry was in Huntsville seeing patients all day and could not have assisted on this surgery. On 9/26/19 Medicare paid $88.08 and on 10/22/19 Medicaid paid $21.63 for this claim. On 3/27/19 Medicare paid $86.06 and on 4/3/19 Medicaid paid $21.63 for the claim that Dr. Embry was an assistant surgeon when he was seeing patients in the Huntsville clinic at the time.

### D.     False Billing for Ultrasound Injections

Ultrasound injections have a particular billing code for which reimbursement is about $100 higher than a standard injection.

MASI stopped doing ultrasound injections in or around 2017 or 2018, but continued to bill private insurers, Medicare, and other Government payors the higher reimbursement code for ultrasound injections.

Relator learned about this fraud when she handled private insurance rejection claims where Humana asked for MASI to provide ultrasound images to verify that ultrasound injections were given. Relator asked MASI's ultrasound tech, Amber, for the images and Amber said there are no images because they stopped doing ultrasounds 2-3 years ago (in 2017 or 2018.)

Relator talked to Dr. Kendrick about this to have it corrected. Dr. Kendrick said he would

talk to Amber. Dr. Kendrick used an image of another patient's ultrasound to send to Humana for this claim to justify the higher code and defraud Humana.

Unlike Humana, Medicare and Government payors do not request proof of ultrasound injections, so MASI has been able to falsely bill them for ultrasound injections without being caught.

**Patients 99-103**, below are examples of false billing for ultrasound. They are also examples of improper billing for an office visit and a scheduled procedure.

In each of the below patients the office visit should not have been charged and MASI falsely used CPT code 20611 (drain/inj joint/bursa w/us) to represent that ultrasound guidance was used.

CPT code 20611 requires ultrasound guidance with permanent recording. The "w/us" is an abbreviation for "with ultrasound." By contrast, CPT code 2010 is "drain/inj joint/bursa w/o us" with the "w/o us" being an abbreviation for "without ultrasound."

No ultrasound guidance was used for these patients, as evidenced by the lack of ultrasound images in these patients' files.

Additionally, MASI's ultrasound machine logs the names and dates of patients receiving ultrasound, and the absence of these patients' names from the ultrasound log will demonstrate that the ultrasound was not used on these patients on these dates.

Because ultrasound guidance was not used, CPT code 20610, not 20611, should have been used.

**Patient 99** and **Patient 100** (husband and wife) both had gelsyn injection procedure in both knees performed by Dr. Kendrick on 1/16/20 and again on 1/23/20. The visits were billed to Medicare using CPT code 20611 instead of 20610, even though ultrasound was not used.

**Patient 101** had bilateral gelsyn injection procedures performed by Dr. Kendrick on 5/10/18, 5/17/18, 5/24/18, 8/8/19, 8/15/19, 8/22/19. The visits were billed to Medicare using CPT code 20611 instead of 20610, even though ultrasound was not used. Medicare and Tricare were

charged $1459.00 and paid $912.72 for each claim. Additionally, $111.00 was improperly charged for each office visit even though the procedures were scheduled in advance.

**Patient 102** had bilateral gelsyn injection procedures performed by Dr. Kendrick on 5/15/19, 5/23/19, and 6/11/19. The visits were billed to Medicare using CPT code 20611 instead of 20610, even though ultrasound was not used. Medicare and Tricare were charged $1459.00 and paid $912.72 for each claim. Additionally, $111.00 was improperly charged for each office visit even though the procedures were scheduled in advance. Medicare and a Medicare supplement plan, Manhattan Life Insurance Company, were charged $1459 and paid $917.87 for each claim.

**Patient 103** had bilateral gelsyn knee injection procedures performed by Dr. Kendrick on 6/12/18, 6/19/18, and 6/26/18. The visits were billed to Medicare using CPT code 20611 instead of 20610, even though ultrasound was not used. Medicare and Tricare were charged $1459.00 and paid $912.72 for each claim. Additionally, $111.00 was improperly charged for each office visit even though the procedures were scheduled in advance. Medicare and a Medicare supplement plan, Manhattan Life Insurance Company, were charged $1459 and paid $917.87 for each claim.

### E.    False Billing for Both Office Visit and Scheduled Procedure

The CMS manual and the NCCI manual provide that E&M services on the same date of service as a minor surgical procedure are included in the payment for the procedure because the decision to perform a minor surgical procedure is included in the payment for the minor surgical procedure and should not be reported separately as an E&M service. Similarly, when the decision to perform the procedure was made previously and the patient is coming in for a planned procedure, it is inappropriate to charge for both E&M services and for the procedure. Only a significant and separately identifiable E&M service unrelated to the decision to perform the minor surgical procedure is separately reportable with modifier 25.[2]

MASI routinely improperly charged Medicare and Medicaid for office visits (i.e., evaluation and management, or E&M services) in addition to scheduled procedures performed on

_____

[2] www.palmettogba.com/palmetto/webTool.nsf/vTool/mod25

the same day in situations where the procedure had already been scheduled, not when the procedure was decided upon during the office visit.

For example, **Patient 71** was routinely charged for an established patient office E&M visit in addition to a scheduled wound debridement procedure. On 12/12/19, 1/16/20, 2/6/20, 2/13/20, 2/27/20, 3/5/20 and 3/26/20, **Patient 71** had appointments with Dr. Kendrick. MASI improperly charged, and was paid by, Medicare Advantage (United Healthcare) for an office visit as well as a scheduled procedure (wound care on her right leg.) The medical records were signed by Dr. Kendrick.

As another example, **Patient 72** was charged for an established patient office E&M visit in addition to a biopsy procedure. On 1/30/20, **Patient 72** saw Dr. Kendrick. MASI improperly charged, and was paid by, Medicare and AR BCBS for an office visit as well as a scheduled biopsy procedure. Medicare was charged $335.00 and paid $146.02 for this procedure. Of that total paid, $55.30 was for the office visit charge that was wrongfully billed. AR BCBS paid $36.63 for this procedure. Of that total paid, $13.87 was for the office visit charge wrongfully billed.

As another example, **Patient 73** was charged for an established patient office E&M visit in addition to treatment of a chainsaw wound that happened 4 days before. On 1/16/20, **Patient 73** saw Dr. Kendrick. MASI improperly charged, and was paid by, Medicare and AR BCBS for an office visit as well as the scheduled wound treatment. $3,392.00 was charged to Medicare and Medicaid for this visit and Medicare and Medicaid paid $1490.10 for this claim. Of that total paid, $55.30 was for the wrongfully billed office visit.

As another example, **Patient 74** was charged for an established patient office E&M visit in addition to a scheduled colonoscopy procedure. On 1/23/20, **Patient 74** saw Dr. Kendrick. MASI improperly charged, and was paid by, Medicare and AR BCBS for an office visit as well as a scheduled colonoscopy procedure. Medicare was charged a total of $2,476 for this claim, which includes a $250.00 charge for the Level 4 office visit that should not have been billed. Medicare paid a total of $345.35 on the entire claim, which includes $122.15 for the wrongfully billed office

visit charge.

**Patient 75** is an example of two types of fraud. Dr. Kendrick saw this patient for two office visits (6/19/19 and 6/26/19), and administered scheduled gelsyn injection procedures. MASI improperly billed Medicare for an office visit and the scheduled procedure both times. Because Patient 75 was scheduled for an injection, charging an additional amount for an office visit with Modifier 25 was inappropriate. Additionally, MASI charged for an ultrasound-guided procedure under CPT code 20611, but no ultrasound was used. On 6/19/19, MASI charged Medicare $1459.00 and was paid $917.87 for this claim.

### F.   False Telemedicine Billing for Non-Substantive Phone Calls with Patients by MASI LPNs, RNs and Lab Techs

On March 18, 2020, in reaction to the Covid-19 pandemic, MASI began doing telemedicine appointments. While Medicare permits billing for legitimate telemedicine office visits, it does not permit billing for simple administrative telephone calls.

MASI bills a level 3 telehealth office visit every time a LPN (Licensed Practical Nurse), RN (Registered Nurse), CMA (Certified Medical Assistant), or lab tech speaks with a patient, even if they are doing nothing more than approving medication refills via fax. Medicare regulations do not permit MASI to bill for its nurses and medical assistances having these brief conversations with patients.

Relator was instructed to bill all telehealth calls as Level 3 office telehealth visits even if the patient just calls and speaks to a nurse. Dr. Kendrick told the nurses to bill this way even when the doctor did not speak to the patient. Linsey Simms was told by Dr. Embry to bill the telehealth visits this way as well. The staff was told to bill for every phone call even if the patient is calling back to request a medication refill, or to tell the doctor something the patient forgot to mention during an actual telehealth.

Marie Hatfield confirmed this is MASI's practice. When Relator objected and told Hatfield this was improper, Hatfield reported the Relator to Dr. Kendrick, who then reported the Relator to the Relator's supervisor, Mary White. Mary White told Relator, "no one cares about your opinion"

and to just do what she was told.

Following are examples of patients being charged Level 3 or sometimes even Level 4 telehealth visits for non-substantive calls to MASI, such as requesting a prescription refill.

**Patient 76**. On 4/2/20 MASI received a medication refill request for this patient from a pharmacy. Nurse (NE) Natasha Ennis, LPN called the patient to discuss it, but the patient never spoke with a doctor. MASI billed under Dr. Kendrick's NPI for a Level 3 televisit. Dr. Kendrick billed CPT code 99213 (with Modifier 95) to Medicare and BCBS AR. Medicare and BCBS AR were charged $111.00 and paid $48.91 for the claim.

**Patient 77**. The patient called MASI on 4/9/20 asking for medication for constipation. The patient spoke with Natasha Ennis, LPN, but never spoke with a physician. MASI charged a Level 3 telephone visit, CPT code 99213, with Modifiers 95 and AQ under Dr. Kendrick's NPI. The patient's insurance is through Medicare and Gerber Life Insurance Company. The total charge is listed as $111.00 but Medicare rejected the claim as CO-45, "charge exceeds fee schedule/maximum allowable or contracted/legislated fee arrangement."

**Patient 78**. The patient called MASI on 4/2/20 wanting refills. She was called back by Natasha Ennis, LPN and didn't speak with a doctor but MASI billed a Level 3 telephone visit under Dr. Kendrick's NPI. Medicare and BCBS AR were charged $111.00. Medicare did not pay this bill, citing CO-45 as defined above.

**Patient 79**. MASI received a request for refills on 4/2/20 for this patient. Natasha Ennis, LPN called the patient and MASI charged a Level 3 telephone visit for the phone call. The patient never spoke to the doctor. MASI billed Medicare under Dr. Kendrick's NPI, using CPT code 99213 (with Modifiers 95 and AQ). Medicare was charged $111.00 and paid $38.99 on this claim.

**Patient 80**. On 4/16/20, Natasha Ennis, LPN called the patient and MASI billed a Level 3 telephone visit for the call under Dr. Kendrick's NPI. The patient never spoke to a doctor. The patient had Humana Gold Plus (HMO), a Medicare Health Plan with Prescription Drug Coverage. MASI billed under Dr. Kendrick's NPI, using CPT code 99213 (with Modifier 95), and charging

$111.00. The Impression/Diagnosis section of the patient's medical records incorrectly states that the patient was seen in office. The total charged was $111.00 and the amount paid was $69.37.

**Patient 81**. The patient, covered by Medicare and Medicaid Arkansas, called MASI to request a prescription refill on 4/9/20. Natasha Ennis, LPN spoke with the patient and billed a Level 3 telephone visit under Dr. Kendrick's NPI. The patient never spoke with a doctor. Medicare paid $60.12 towards the claim. Arkansas Medicaid paid $15.08 for the claim.

**Patient 82**. The patient called MASI on 4/15/20 and spoke with Shawna Clark, RN. The patient never spoke to a doctor. MASI charged a Level 4 televisit, using Dr. Kendrick's NPI and CPT code 99214 (established patient office visit, 25 minutes) for this telehealth call to Blue Cross Arkansas Medicaid, which paid $135.30 on the claim.

**Patient 83**. The patient called MASI on 4/14/20 to request a prescription refill and spoke to Linsey Sims, LPN. The patient never spoke to a doctor. MASI charged Medicare and Arkansas Medicaid for a Level 3 telehealth visit, CPT code 99213 (with Modifiers 95 and AQ), for the phone call, using Dr. Embry's NPI. Medicare paid $21.80 for the claim.

**Patient 84**. A phone call was made by Kim Main, RN to the patient on 5/7/20, to discuss lab results. The patient was charged a Level 3 telephone visit but never spoke with a doctor. MASI charged a Level 3 telephone visit to AARP Medicare Complete, through UnitedHealthcare. MASI billed under Dr. Kendrick's NPI, using CPT codes 99213 (with Modifier 95) and 85025 (CBC panel) to AARP United Health Medicare. The total charge is listed as $148.00. United Healthcare (Medicare) paid $48.91 for the telehealth visit.

**Patient 85**. On 4/30/20 the patient had a telephone visit to refill the patient's prescription with Natasha Ennis, LP. The patient did not speak to a doctor. MASI billed Medicare and Medicaid AR $111.00 for a Level 3 office visit, CPT code 99213, (with Modifier 95 and AQ), using Dr. Kendrick's NPI. The Impression/Diagnosis section of the patient's records states: "Patient was seen in office today," even though it was a telehealth phone call. The medical record and hard copies of prescriptions for Levothyroxine and Simvastatin are signed by Dr. Kendrick. Medicare

did not pay for this claim and forwarded the claim to AR Medicaid.

**Patient 86**. On 4/22/20 this patient had a telephone visit with Gina Dickey, ARPN, but MASI billed Medicare and Medicaid a Level 3 office visit using Dr. Kendrick's NPI. Gina Dickey's 4/22/20 Appointment List includes an 11:15 am Facetime appointment with this patient. Dr. Kendrick's 4/22/20 Appointment List does not list this patient. The Medical Record indicates that on 4/22/20 the patient had an established patient office visit and that the "Patient was seen today by Gina Dickey, ARPN." The attending physician is listed as Dr. Kendrick, but Kendrick does not work in Huntsville on Wednesdays, and this patient is not listed on Kendrick's schedule. The Treatment Plan section notes: "The patient was reassured about the current condition and symptoms. The patient understood the explanations and is agreeable. Re-cert medical marijuana form for ptsd." The medical record was signed by Dr. Kendrick, dated 4/23/20, which is the day after the patient had the appointment with Gina Dickey in which she billed under Dr. Kendrick's NPI. Medicaid paid $47.91 on the claim.

**Patient 87**. On 4/16/20 the patient had a televisit with Natasha Ennis, LPN, and never spoke to a doctor. MASI billed a Level 4 telehealth visit, CPT code 99214 (established patient office visit, 25 minutes) (with Modifier 95) for a total charge of $161.00, using Dr. Kendrick's NPI. Medicaid paid a portion of the bill.

**Patient 88**. On 4/15/20 this patient called MASI requesting a prescription refill, speaking with a nurse and not a physician. MASI billed a Level 4 office visit using Dr. Embry's NPI, under CPT code 99214. There is a prescription for metformin "from Gina [Dickey, ARPN]" but signed by Dr. Embry. Medicaid was charged $161.00 and paid $70.05 for this telehealth call in which the patient was calling for a refill on medication.

**Patients 89, 90, 91. 92**. On 4/30/20 these patients had a Level 3 Televisit. Although MASI billed $111.00 under Dr. Kendrick's NPI, it is believed the calls were with a nurse.

### G.    False Billing for Level 4 Evaluation and Management Office Visits

Medicare only permits physicians to bill for a Level 4 Evaluation and Management E/M

Office Visit with an established patient when the visit involves a detailed history, detailed examination and medical decision making of moderate complexity. CPT requires two of the three key components to bill for a level-IV visit.

When physicians report a level 4 E/M code, they are representing that the patient requires medical management for an exacerbation of an existing chronic condition, a complication, or a new problem.

A detailed history requires that the physician note at least four elements in the history of present illness (HPI) (or the status of at least three chronic or inactive conditions), a review of two to nine organ systems (ROS), and either the patient's past history, family history or social history (PFSH).

Dr. Embry bills all his office visits as a level 4, regardless of whether the office visits require this level of management.

Examples of this type of false billing are described in other sections of this Complaint with regard to **Patients 74, 82, 87 and 88**.

## IX.   DEFENDANTS' FALSE CLAIMS SUBMITTED TO MCOs ALSO CONSTITUTE FCA VIOLATIONS

While many of Defendants' false claims were submitted directly to government payors (such as Medicare, Medicaid, and Tricare), Defendants' false claims to Medicare and Medicaid managed care organizations ("MCOs") are also actionable under the False Claims Act. In 2009, the FCA was amended specifically to clarify that claims submitted to private entities, like MCOs, are actionable under the FCA.

Medicare Advantage and Medicaid managed care plans (collectively "managed care") are funded by the government but administered and managed by private insurance companies. Managed care is now the primary health care model for government health care programs. As of 2019, 84% of Medicaid beneficiaries and 36% of Medicare beneficiaries are enrolled in a managed care plan. Hundreds of billions of taxpayers' dollars flow through these managed care plans annually. In the 2009 FCA amendments, Congress intended to expand the False Claims Act to

protect the integrity of the public fisc, regardless of whether public monies flow through an MCO or any other third-party.

Under the managed care model, the government pays a private insurance company (*i.e.* a managed care organization, or MCO) a monthly fee to provide insurance coverage for government health care plan beneficiaries. The monthly payment is a fixed amount paid on a per beneficiary basis. It covers all healthcare and administrative costs for that beneficiary for a set period of time. If a beneficiary's healthcare costs exceed the fixed amount, the MCO is responsible for the additional costs. If the healthcare costs are lower than the fixed amount, the MCO can keep the difference. This managed care model is fundamentally different than the fee-for-service model used in traditional Medicare and Medicaid. In fee-for-service plans, after the healthcare service is provided, the government pays the provider on a per claim basis, *i.e.*, "fee-for-service."

Under the plain language of the FCA, fraud against any entity spending Government funds to advance a government program or interest, such as an MCO, is actionable. The FCA defines actionable "claims" broadly to include "any request . . . for money . . . whether or not the United States has title to the money . . . that . . . (ii) is made to a . . . recipient, if the money . . .  is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government-- (I) provides or has provided any portion of the money or property requested or demanded . . . ." 31 U.S.C.S. § 3729(b)(2).

The Senate Report for the 2009 amendments states that this "section of the bill clarifies that liability under section 3729(a) attaches whenever a person knowingly makes a false claim to obtain money or property, any part of which is provided by the Government without regard to whether the wrongdoer deals directly with the Federal Government; with an agent acting on the Government's behalf; or with a third party contractor, grantee, or other recipient of such money or property." S. REP. 111-10, 11, 2009 U.S.C.C.A.N. 430, 438. "The new language underscored Congress's intent that FCA liability attach to any false claim made to an entity implementing a program with government funds, regardless of whether that entity was public or private." *U.S. ex*

*rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 638 (7th Cir. 2016); *see also Commonwealth ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, 334 F. Supp. 3d 394, 409 (D. Mass. 2018) ("Under the [Massachusetts FCA], a person who makes false claims to a government contractor is liable if the money is to be spent to advance a program or interest of the commonwealth.") The 2009 FCA amendments establish that Congress intended FCA liability to attach to false claims submitted to MCOs.

Additionally, false claims to MCOs are material, i.e., they have "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. 3729(b)(4). False statements and claims to an MCO can be material even where the MCO receives capitated payments from the government. As described in *Garbe*, materiality "requires only that the false record or statement influence the 'payment or receipt of money or property'—no government decision is required." 31 U.S.C. § 3729(b)(4). *Garbe*, 824 F.3d at 639. The plaintiff "is required to show only that [the defendant's] allegedly false claims were material to [defendant's] receipt of more money than it should have gotten." *Id*. Likewise in *Martino-Fleming*, the court held that false statements to an MCO can satisfy the materiality standard. *Martino-Fleming*, 334 F. Supp. 3d at 408. Whether a provider submits a claim directly to a state's Medicaid program or to an MCO, providers must comply with specific Medicaid regulations that go "to the heart of the bargain." *Id*. The violation of these regulations is sufficient to establish that false statements were material to the payment decision. *See also U.S. ex rel. Robinson v. Indiana Univ. Health Inc.*, No. 113-CV-02009, 2016 WL 10567964, at * 1, *12 (S.D. Ind. Mar. 30, 2016) (summarizing Medicaid managed care in Indiana and denying motions to dismiss relator's allegations of false claims for health care services provided by unqualified personnel to Medicaid managed care members with high-risk pregnancies). If a healthcare provider violates a material Medicaid regulation that provider is not entitled to Medicaid funds. It makes no difference whether the claim is submitted directly to the Medicaid agency or to an MCO that receives Medicaid funds. A provider cannot knowingly violate Medicaid regulations, receive Medicaid funds, and avoid

FCA liability.

Even under the capitated payment model, fraud on an MCO is material and causes financial damage to the government. First, there are multiple ways in which fraud on an MCO can cause financial damage to the government. For example, when a defendant falsely certifies the medical necessity for healthcare services paid for by MCOs, MCOs spent tens of millions of dollars in federal and state government funds reimbursing medical procedures that were not properly preauthorized. By virtue of these false statements, the Government suffers actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

But even if fraud on an MCO did not cause the government financial loss, FCA liability still attaches. Fraud against any entity spending government funds is actionable under the plain meaning of the Act, whether or not the fraud causes the government to pay more or suffer actual financial harm. "[R]ecovery under the FCA is not dependent upon the Government's sustaining monetary damages." *U.S. v. Rogan*, 2006 WL 8427270, at *21 (N.D. Ill. Oct. 2, 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008).

In the managed care context, the FCA "does not require the government to prove actual or specific damages." *Martino-Fleming*, 334 F. Supp. 3d at 409. "The fact that Medicaid did not suffer damages because it paid a capitated rate does not negate liability because liability attaches to the 'claim for payment.'" *U.S. ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, No. CV 15-13065-PBS, 2018 WL 4539684, at *7 (D. Mass. Sept. 21, 2018) (citing *U.S. v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1173 (9th Cir. 2016) ("Proof of damage to the government is not required."). Further, the plaintiff "is not required to trace the movement of currency from the U.S. Treasury through the Medicare Part D funding structure." *Garbe*, 824 F.3d at 639. The same is true of other grant and block funding cases. *See U.S. v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d 430, 443 (E.D. Pa. 2004) ("Whether or not the United States Government would be out additional money beyond that already appropriated … it would suffer a loss if the money appropriated for legitimate purposes were instead wasted on a false claim.") (citations and internal

quotations omitted).

Thus, materiality can be established independent of financial harm. This is particularly relevant where important government interests – such as the provision of healthcare – are compromised by fraudulent conduct. As described in *Martino-Fleming*, it is not simply financial harm, but also the integrity of the Medicaid program at risk where providers violate Medicaid rules and regulations and submit false claims.

In the end, both the materiality inquiry and the reach of the FCA are broad enough to encompass false claims submitted to MCOs operating government funded healthcare plans. If a misrepresentation goes "to the heart of the bargain," it is likely material. Whether the statement was made to the government or to an intermediary spending government funds is a distinction without a difference. Defendants' argument that healthcare providers can submit false claims to MCOs without liability under the FCA is wrong and should be rejected.

## X.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

Relator re-alleges and incorporates by reference the allegations in this pleading.

By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the Government and MCOs for payment or approval, as follows:

As described above, Defendants submitted false claims to the Government and to MCOs, in violation of applicable statutes, regulations and rules, and in violation of Defendants' agreement to comply with these statutes and rules.

The Government (and MCOs using Government funds) paid the false claims described herein.

Defendants' fraudulent actions, as described in this Complaint, are part of a widespread, systemic pattern and practice throughout MASI of knowingly submitting or causing to be

submitted false claims to the Government and MCOs.

Defendants' fraudulent actions described herein have resulted in damage to the Government equal to the amount paid or reimbursed to Defendants by the Government through Medicare and Medicaid for such false or fraudulent claims, and in the higher amounts paid to MCOs and MAOs by the Government as a result of the fraudulent claims submitted.

By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Government for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A); that is, Defendants knowingly made or presented, or caused to be made or presented, to the Government claims for payment for the equipment and products provided by Defendants to Defendants' patients who were covered by Medicare, Medicaid, TRICARE, and MCO, and MAO, or other Government-funded program.

By reason of the foregoing, the Government suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017.)

## SECOND CAUSE OF ACTION
### False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

Relator re-alleges and incorporates by reference all paragraphs in this pleading.

By virtue of the acts described above, Defendants knowingly made or used false records or statements material to false or fraudulent claims submitted to the Government or to MCOs.

Payment of those false or fraudulent claims by the Government, or by MCOs using government funds, was a reasonable and foreseeable consequence of those statements.

Defendants made or used, or caused to be made or used, such false records or statements

38

with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

Defendants made these statements to get a false or fraudulent Medicare claim paid or approved by the Government, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

These false records and statements included false Medicare and Medicaid claim forms, false statements to MCOs, false or fraudulent prescriptions, false certifications on provider enrollment forms and false and misleading representations on claim forms, including false statements: (1) regarding the identity of the person providing the services; (2) regarding the level or type of services provided or the appropriate code for the services provided; (3) regarding whether ultrasound was used in procedures; and (4) that claims for payment for opioid prescriptions were reasonable and necessary for the diagnosis or treatment of individual patients and had a legitimate medical purpose, when, in fact, the contrary was true.

By reason of the foregoing, the Government suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017.)

## **PRAYER**

WHEREFORE, Relator prays for the following relief:

1.     A permanent injunction requiring Defendants to cease and desist from violating the federal FCA;

2.     Under the FCA, Judgment if favor of the Government against Defendants in an amount equal to three times the amount of damages the Government has sustained as a result of

the Defendants' unlawful conduct;

3.     Civil monetary penalties payable to the Government for each false and fraudulent claim submitted to the Government by Defendants, as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $11,665 and $23,331 for penalties assessed after June 20, 2020.)

4.     The maximum relator's share allowed pursuant to 31 U.S.C. §3730(d).

5.     An award to Relator pursuant to 31 U.S.C. §3730(d) of reasonable attorneys' fees, costs, and expenses;

7.     Prejudgment interest;

8.     All costs incurred in bringing this action;

9.     Such other relief as the Court deems just and equitable.


## XI.   JURY DEMAND

Relator hereby demands a jury trial on all issues triable to a jury.

Dated:  September 17, 2020.

/s/ Daniel Ford
Daniel Ford
Ark. Bar No. 2014162
Sanford Law Firm, PLLC
800-615-4946 (Main)
501-904-1653 (Direct)
daniel@sanfordlawfirm.com
www.sanfordlawfirm.com
650 S. Shackleford Rd., Suite 411
Little Rock AR 72211


Jeffrey A. Newman (pro hac vice to be filed)
Jeffrey Newman Law
One Story Terrace
Marblehead MA 01945
Phone: 617-823-3217
Fax: 781-639-8688
jeffrey.newman1@gmail.com


Cory S. Fein (pro hac vice to be filed)
Cory Fein Law Firm
712 Main St., Suite 800
Houston, TX  77002
cory@coryfeinlaw.com
(281) 254-7717 (phone)
(530) 748-0601 (fax)


**ATTORNEYS FOR RELATOR**