## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

| | |
|---|---|
| UNITED STATES *ex rel.* KARLA CARDON, | Case No. 5:22-cv-05019-TLB |
| Plaintiff-Relator, | **FIRST AMENDED COMPLAINT FOR:** |
| v. | **Violations of False Claims Act, 31 U.S.C. § 3729 *et seq.*** |
| MINIMAL ACCESS SURGERY, INC., and JOHN HENRY KENDRICK, | |
| Defendants. | **JURY TRIAL DEMANDED** |

**RELATOR'S FIRST AMENDED COMPLAINT
PURSUANT TO FED. R. CIV. P. 15(a)(1)(B)**

## I.      INTRODUCTION

1.      Relator Karla Cardon ("Relator"), through her attorneys and on behalf of the United States, hereby files this First Amended Complaint pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA"), against Minimal Access Surgery, Inc. ("MASI"), and John Henry Kendrick ("Dr. Kendrick") (collectively, "Defendants").

2.      Defendant MASI provides primary care and minimally invasive surgeries out of two clinics in Arkansas. Dr. Kendrick is MASI's owner, President, and a physician at both clinics. Relator is a coder/biller at one of the MASI clinics.

3.      This action arises out of the Defendants' scheme to defraud the United States through the submission of false and fraudulent claims and false statements material to false claims to Federal health care programs, including Medicare, Medicaid, TRICARE, and various Medicare Advantage Organizations ("MAOs") and Medicaid Managed Care Organizations ("MCOs"). The claims were false and fraudulent because they were for services that did not occur as Defendants reported them to have occurred and/or for services that were unreasonable, unnecessary, or unwarranted.

4.      Specifically, Defendants' fraudulent practices included:

A.  **False billing for services "incident to" services performed by a physician:** When a MASI nurse practitioner ("NP") or clinical nurse specialist ("CNS") conducted patient visits alone and without physician supervision, Defendants fraudulently billed Federal health care programs for the visits as if the visits were performed and/or supervised by a physician, resulting in unjustified higher reimbursements to Defendants.

B.  **False billing for a physician assisting Dr. Kendrick in surgery:** Defendants billed Federal health care programs for professional services during surgeries using modifier "82," which indicated that a MASI physician assisted in the surgeries, when in fact either nobody from MASI or a MASI NP, not a physician, assisted during the surgeries.

1

C. **False billing for medication refill phone calls between patients and MASI nurses:** When MASI licensed practical nurses ("LPNs") and registered nurses ("RNs) spoke with patients by telephone about medication refills, MASI fraudulently billed the visits as level 3 or level 4 visits under Dr. Kendrick's provider number, even though the law permits visits performed by LPNs and RNs outside the presence of a physician to be billed at no more than level 1.

D. **False billing for both an office visit and a scheduled procedure with a patient on the same day:** When Dr. Kendrick saw patients for a procedure and an office visit on the same day and the medical issue addressed during the office visit was related to the scheduled procedure, MASI fraudulently billed for both the procedure and the office visit, even though the law permits billing for an office visit on the day of a procedure only when the office visit involves a "significant, separately identifiable evaluation and management service."

E. **False billing for ultrasound-guided knee injections:** When Dr. Kendrick performed knee injections without ultrasound guidance, MASI used a billing code fraudulently representing that Dr. Kendrick had performed the injections with ultrasound guidance.

F. **Double billing for medication refill office visits:** When a patient visited MASI for a refill of both pain medication and anxiety medication prescriptions, Defendants fraudulently billed for two visits, a pain management office visit under Dr. Kendrick's provider number *and* an anxiety treatment office visit under the provider number of Dr. Thomas Embry.

G. **Billing office visits for Covid-19 tests:** Defendants billed an office visit when patients visited MASI clinics for Covid-19 tests performed by MASI laboratory technicians in the clinics' parking lots. These visits were not medically necessary and the laboratory technicians did not render any services that would meet the requirements for billing an office visit.

H. **False billing for office visits with existing patients as office visits with new patients under the NP and CNS provider numbers:** When MASI issued login credentials to its NPs and CNSs in late 2021 to allow them to document their own office visits and bill under their own provider numbers, MASI instructed the NPs and CNSs to bill their next visits with existing MASI patients as new patient visits.

I. **Retroactively falsifying medical records to match fraudulent bills**: When payors requested MASI to provide documents supporting the services billed, Dr. Kendrick altered patients' medical records to match the information shown on the bills that MASI previously had submitted to payors.

5.    Defendants have engaged in some of the wrongful practices described herein since

2

at least 2016. The fraud is ongoing.

## II.     THE PARTIES

### A.  Relator Karla Cardon

6.     Relator, a resident of Madison County, Arkansas, has worked as a coder/biller at the MASI clinic in Huntsville, Arkansas, since February 2016. For brief periods, Relator also has worked at the MASI clinic in Springdale, Arkansas. At both clinics, Relator observed that Defendants engaged in the fraudulent billing practices alleged herein.

7.     Relator has direct and independent knowledge of the fraud alleged herein and voluntarily disclosed this information to the United States before filing suit, pursuant to 31 U.S.C. § 3730(e)(4)(B)(2). Relator disclosed information that is independent of, and materially adds to, any publicly disclosed allegations or transactions.

8.     Relator brings this action on behalf of the United States pursuant to the *qui tam* provisions of the FCA. On behalf of the United States, Relator seeks recovery for damages to Federal health care programs, including, but not limited to, the federal-state Medicaid program, established under Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq*.; the Medicare Part B program; the Medicare Part C program (Medicare Advantage); the United States Department of Defense TRICARE and CHAMPUS health care programs, established pursuant to 10 U.S.C. § 1071, *et seq*.; and the Federal Employees Health Benefits Program ("FEHBP"), established pursuant to 5 U.S.C. § 8901, *et seq*.

### B.  Defendant MASI

9.     Defendant MASI is an Arkansas corporation headquartered at 5230 Willow Creek Rd., Springdale, Arkansas 72762. MASI operates two medical clinics, in Huntsville and Springdale. The Huntsville clinic is also known as Madison County Medical & Surgical Clinic.

Both the Huntsville and Springdale clinics provide primary care and minimally invasive surgeries to beneficiaries of Federal health care programs.

**C. Defendant Dr. Kendrick**

10.     Defendant Dr. Kendrick, a physician and resident of Washington County, Arkansas, owns MASI and serves as its President. He works at both MASI clinics.

### III.     JURISDICTION AND VENUE

11.     This action arises under the FCA. This Court has jurisdiction over this case pursuant to 31 U.S.C. § 3732 and 28 U.S.C. §§ 1331 and 1345.

12.     This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because each of them resides in and/or transacts business in this District, and because some of the acts giving rise to Relator's claims occurred within this District.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).

### IV.     RELEVANT LAW

**A. The False Claims Act**

14.     The False Claims Act provides, in pertinent part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

. . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

15.     For purposes of the False Claims Act, "the terms 'knowing' and 'knowingly' mean that a person, with respect to information[,] (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

16.     The False Claims Act defines the term "claim," in pertinent part, as

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]

31 U.S.C. § 3729(b)(2).

17.     For purposes of the False Claims Act, the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

**B.  The Medicare Program**

18.     Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq*., establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program ("Medicare").

19.     The United States provides reimbursement for Medicare claims from the Medicare Trust Funds through the Centers for Medicare and Medicaid Services ("CMS"). CMS, in turn, contracts with Medicare Administrative Contractors (hereinafter "MACs"), formerly known as

"fiscal intermediaries," to review, approve, and pay Medicare bills, called "claims," received from health care providers, such as Defendants. In this capacity, the MACs act on behalf of CMS.

20.     The MACs typically reimburse health care providers, such as Defendants, rather than Medicare beneficiaries, because the beneficiaries typically assign their reimbursement rights to their providers. As a result, the providers submit their reimbursement claims directly to Medicare.

21.     In order to bill Medicare, a provider must submit an electronic or hard-copy claim form called a CMS-1500 form. On the CMS-1500 form, the provider must state, among other things, the procedure(s) for which it is billing Medicare, the identity of the patient, the provider number, and a brief narrative explaining the diagnosis and the medical necessity of the services rendered. In submitting a CMS-1500 form, the provider certifies that "the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision."

22.     All healthcare providers, including Defendants' providers, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare.

23.      Medicare reimburses only for reasonable and necessary medical services furnished to beneficiaries, and Medicare regulations bar payment for services that are not reasonable and necessary. *See* 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k).

24.     Because it would not be feasible to review medical documentation before paying each claim, the MACs generally make payment on the basis of the provider's certifications on the Medicare claim. The MACs, in turn, obtain reimbursement from CMS for the claims that they pay.

25.     Novitas Solutions, Inc. ("Novitas"), serves as the MAC for Medicare Part A and B billing in Arkansas. *See* https://www.cms.gov/files/document/macs-state-jun-2021.pdf.

*i.   Billing for Evaluation and Management Office Visits*

26.     The American Medical Association ("AMA") publishes an annual manual of Current Procedural Terminology ("CPT") codes. The CPT Manual is a listing of descriptive terms and identifying codes for reporting the nature and complexity of medical services and procedures performed by physicians. The purpose of the terminology is to provide a uniform language that will accurately describe medical, surgical, and diagnostic services. In 2000, to implement the Health Insurance Portability and Accountability Act of 1996, the Department of Health and Human Services designated the CPT code set as a national coding standard for physicians and other health care professional services and procedures. *See* 45 C.F.R. § 162.1002(a)(5). As a result, for all physician services billed to Federal health care programs, including Medicare and Medicaid, CPT codes must be used in describing health care services rendered.

27.     Health care providers must bill for evaluation and management ("E/M") visits using the CPT code that best represents the patient type (whether new or established), setting of service (office, hospital, etc.), and level of service performed. *See* CMS, Evaluation and Management Services Guide at 6 (Feb. 2021 rev.) (explaining that a "new patient" is an "individual who did not receive any professional services from the physician/non-physician practitioner (NPP) or another physician of the same specialty who belongs to the same group practice within the previous 3 years," and that an "established patient" is an "individual who receive[d] professional services from the physician/NPP or another physician of the same specialty who belongs to the same group practice within the previous 3 years")[1]; *see also* Medicare Claims Processing Manual, Pub. No. 100-04, Ch. 12, § 30.6.7 (Jan. 2022 rev.).

---

[1] Available at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/eval-mgmt-serv-guide-ICN006764.pdf.

28.     There are various sets of CPT codes for E/M office visits, depending on the context, but the highest level of E/M visit is always a level 5 (the last digit of the CPT code). E/M office visit code descriptions relevant to this matter include:

99211 – Office or other outpatient visit for the evaluation and management of an established patient, that may not require the presence of a physician or other qualified health care professional. Usually, the presenting problem(s) are minimal.

99202 – Office or other outpatient visit for the evaluation and management of a new patient, which requires a medically appropriate history and/or examination and straightforward medical decision making. Typically, 15-29 minutes of total time is spent on the date of the encounter).

99212 – Office or other outpatient visit for the evaluation and management of an established patient, which requires a medically appropriate history and/or examination and straightforward medical decision making. Typically, 10-19 minutes of total time is spent on the date of the encounter.

99203 – Office or other outpatient visit for the evaluation and management of a new patient, which requires a medically appropriate history and/or examination and low level of medical decision making. When using time for code selection, 30-44 minutes of total time is spent on the date of the encounter.

99213 – Office or other outpatient visit for the evaluation and management of an established patient, which requires a medically appropriate history and/or examination and low level of medical decision making. When using time for code selection, 20-29 of total time is spent on the date of the encounter.

99204 – Office or other outpatient visit for the evaluation and management of a new patient, which requires a medically appropriate history and/or examination and moderate level of medical decision making. When using time for code selection, 45-59 minutes of total time is spent on the date of the encounter.

99214 – Office or other outpatient visit for the evaluation and management of an established patient, which requires a medically appropriate history and/or examination and moderate level of medical decision making. When using time for code selection, 30-39 minutes of total time is spent on the date of the encounter.

99205 – Office or other outpatient visit for the evaluation and management of a new patient, which requires a medically appropriate history and/or examination and high level of medical decision making. When using time for code selection, 60-74 minutes of total time is spent on the date of the encounter.

99215 – Office or other outpatient visit for the evaluation and management of an established patient, which requires a medically appropriate history and/or examination and high level of medical decision making. When using time for code selection, 40-54 minutes of total time is spent on the date of the encounter.

29.     Section 4511 of the Balanced Budget Act of 1997 removed the restriction on settings for services furnished by NPs, CNSs, and physician assistants. Payments are allowed for services furnished in all settings by these health care professionals but only if no facility or other provider charges, or is paid in connection with the service. Payment is equal to the lesser of 80 percent of the actual charge or 85 percent of the physician fee schedule. Medicare rules do not provide for separate reimbursement of services performed by other nurses, such as RNs or LPNs, except that, as noted above, a health care provider may bill using CPT code 99211 for a patient visit performed by an RN or LPN if that visit typically involves only "minimal" problems and does "not require the presence of a physician or other qualified health care professional."

30.     For office visits coded as 99211 in Arkansas, Novitas further explains that, "For office or other outpatient services, if the physician's or other qualified health professional's time is spent in the supervision of clinical staff who perform the face-to-face services of the encounter, use code 99211." Notably, however, neither the CPT Manual nor Novitas permits physicians to use higher level CPT codes (*e.g*, 99213) for office visits performed by RNs or LPNs without a physician or other qualified health professional (*e.g*., a NP or physician assistant) present during the patient encounter.

31.     Medicare reimbursement varies by CPT code and locality of service. Higher level codes represent more complex visits and yield higher reimbursement levels. *See* Medicare

Claims Processing Manual, Pub. No. 100-04, Ch. 12, § 30.6.1.D. The table below[2] shows

reimbursement for different E/M office visits nationwide and within Arkansas in 2022.

| Visit Level | Patient Type | CPT Code | Nationwide Non-Facility Price | Arkansas Non-Facility Price |
|---|---|---|---|---|
| 1 | New | 99201 | | |
| 1 | Established | 99211 | $23.53 | $20.75 |
| 2 | New | 99202 | $74.06 | $66.46 |
| 2 | Established | 99212 | $57.45 | $51.44 |
| 3 | New | 99203 | $113.85 | $102.66 |
| 3 | Established | 99213 | $92.05 | $83.53 |
| 4 | New | 99204 | $169.57 | $154.22 |
| 4 | Established | 99214 | $129.77 | $118.50 |
| 5 | New | 99205 | $224.25 | $204.24 |
| 5 | Established | 99215 | $183.07 | $167.11 |

32.     In response to the Covid-19 pandemic, providers can bill for telehealth office

visits using the appropriate CPT code with Modifier 95, which Novitas in Arkansas defines as

"synchronous telemedicine service rendered via real-time Interactive audio and video

telecommunications system." *See* Telehealth Service Modifiers (novitas-solutions.com).[3]

   ii.   *Billing for "Incident to" Services*

33.     Under Medicare, services of NPs and physician assistants may be billed (1) under

the provider number of the NP or physician assistant who provided the service, in which case

Medicare pays 85% of what it would pay for the same services billed under the provider number

of a physician (*see* 42 C.F.R. §§ 414.52(d), 414.56(c)), or (2) under the physician's provider

number if the physician "directly supervised" the service, in which case the service is considered

_____

[2] 2022 Physician Fee Schedule, available at: https://www.cms.gov/medicare/physician-fee-schedule/search?Y=0&T=4&HT=0&CT=2&H1=99215&C=71&M=5
[3] Available at https://www.novitas-solutions.com/webcenter/portal/MedicareJH/pagebyid?contentId=00144501

"incident to" the supervising physician's service (*see* 42 C.F.R. § 410.26(b)(5)). The regulations further specify that "[d]irect supervision in the office setting means the physician (or other supervising practitioner) must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed." 42 C.F.R. § 410.32(b)(3)(ii).

34.     In the comments accompanying the incident to regulations, CMS addressed the requests of commenters to clarify whose provider number should be used when billing for incident to services and supplies: the physician who orders the services or the physician who supervises the personnel who perform the services. In response, CMS stated:

> When a claim is submitted to Medicare under the billing number of a physician (or other practitioner) for an incident to service, the physician is stating that he or she either performed the service or directly supervised the auxiliary personnel performing the service. Accordingly, the Medicare billing number of the ordering physician (or other practitioner) should not be used if that person did not directly supervise the auxiliary personnel.

CMS, *Medicare Program; Revisions to Payment Policies and Five-Year Review of and Adjustments to the Relative Value Units Under the Physician Fee Schedule for Calendar Year 2002*, 66 Fed. Reg. 55246, 55267 (Nov. 1, 2001).

35.     In short, if there was no physician in the office suite where a NP or physician assistant performed a service, then that service must be billed at the 85% rate under the provider number of the NP or physician assistant who performed the service.

### iii.     *Billing for mid-level providers assisting in surgery*

36.     If a NP or physician assistant assists in a surgery, then Medicare pays "85 percent of the physician fee schedule amount that would be allowed under the physician fee schedule if the assistant-at-surgery service were furnished by a physician." *See* 42 C.F.R. §§ 414.52(d),

414.56(c). According to Novitas's directions,[4] when a NP or physician assistant assists in a surgery, that service should be billed using modifier "AS". By contrast, if a physician assists another physician in performing a surgery, the assisting physician's service should be billed using the modifier "80", "81", or "82". Modifier 80 is for use in a "non-teaching setting," *i.e.*, outside of a teaching hospital; modifier 81 is for "[m]inimum surgical assistant services;" and modifier 82 is for use in a teaching hospital "if there is no approved training program related to the medical specialty required for the surgical procedure or no qualified resident was available."

　　　　iv.　*Billing a scheduled procedure code and an office visit*

　　37.　Under Medicare rules, when a patient visits a physician to have a procedure performed, the default rule is that the physician cannot bill Medicare for both the procedure and the office visit—the amount that Medicare pays for the procedure is meant to cover the cost of the visit, too. There is an exception to that rule: Medicare allows the physician to charge the government for both the procedure and the procedure-related visit if, during that visit, the physician addresses some significant medical issue that is unrelated to the procedure. The physician must signal to Medicare the applicability of this exception by using a special billing code – "Modifier 25." *See* CMS, *Medicare Claims Processing Manual*, § 40.2(A)(8) ("Modifier '-25' is used to facilitate billing of evaluation and management services on the day of a procedure for which separate payment may be made. It is used to report a significant, separately identifiable evaluation and management service by [the] same physician on the day of a procedure."). Thus, Novitas explains that "Modifier 25 is defined as a significant, separately identifiable Evaluation and Management (E/M) service by the same physician or other qualified health care professional

---

[4] Available at https://www.novitas-solutions.com/webcenter/portal/MedicareJH/pagebyid?contentId=00144530.

on the same day of a procedure or other service. . . . Modifier 25 indicates that on the day of a procedure, the patient's condition required a significant, separately identifiable E/M service, above and beyond the usual pre and post-operative care associated with the procedure or service performed."[5]

> v.   _Billing for ultrasound-guided injections_

38.     If a physician performs a procedure involving an injection into the knee of Gelsyn-3 or another hyaluronic acid product, and the physician uses ultrasound to guide the injection, then the procedure should be billed using CPT code 20611, which, according to the CPT Manual, applies to "Arthrocentesis, aspiration and/or injection, major joint of bursa (eg, shoulder, hip, knee, subcromial bursa); with ultrasound guidance, with permanent recording and reporting." In Arkansas, the current Novitas physician fee schedule amount for CPT code 20611 for a participating provider is $90.44.

39.     If the physician performs the same knee injection procedure without ultrasound, then the procedure should be billed using CPT code 20610, which, according to the CPT Manual, applies to "Arthrocentesis, aspiration and/or injection, major joint of bursa (eg, shoulder, hip, knee, subcromial bursa); without ultrasound guidance." In Arkansas, the current Novitas physician fee schedule amount for CPT code 20610 for a participating provider is $58.87.

**C.  The Medicaid Program**

40.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The United States partly funds and oversees the Medicaid program through CMS.

---

[5] Available at https://www.novitas-solutions.com/webcenter/portal/MedicareJH/pagebyid?contentId=00144547

41.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding. *See* 42 U.S.C. § 1396a. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. *See* 42 U.S.C. § 1396d(b). The FMAP for Arkansas is currently 71.62%. *See* 85 Fed. Reg. 76586, 76588 (Nov. 30, 2020).

42.     The Arkansas Medicaid program requires that "[a]ll services provided must be medically necessary." Arkansas Medicaid Provider Manual 142.100(D); *see also* 016-06-03 Ark. Code R. § 19, 142.000(D).

### D.  The Medicare Advantage Program and Medicaid Managed Care Organizations

43.     While Defendants submitted many of their false claims directly to Federal health care programs (such as Medicare, Arkansas Medicaid, TRICARE, and FEHBP), Defendants also submitted false claims indirectly to Medicare via private Medicare Advantage plans and to Arkansas Medicaid via private Medicaid managed care organizations ("MCOs").

44.     Under the managed care model, the government pays a private insurance company a per-patient per-month fee to provide health benefits to beneficiaries of government health insurance programs such as Medicare Advantage and Arkansas Medicaid.

45.     In 2009, Congress amended the FCA to make clear that it applies to claims to entities such as Medicare Advantage plans and Medicaid MCOs that are funded by the government. Specifically, the FCA now provides that:

> the term "claim"—
> (A) means any request or demand . . . that—
> (i)   is presented to an officer, employee, or agent of the United States; or
>        (ii) *is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest*, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. . . .

31 U.S.C. § 3729(b)(2) (emphasis added).

46.     The Senate Report for the 2009 FCA amendments explained that this "section of the bill clarifies that liability under section 3729(a) attaches whenever a person knowingly makes a false claim to obtain money or property, any part of which is provided by the Government without regard to whether the wrongdoer deals directly with the Federal Government; with an agent acting on the Government's behalf; or with a third party contractor, grantee, or other recipient of such money or property." S. Rep. 111-10, 11, 2009 U.S.C.C.A.N. 430, 438.

## E.  TRICARE

47.     TRICARE, formerly known as the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), is the United States Department of Defense Military Health System's health care program. It provides civilian health benefits for U.S Armed Forces military personnel, military retirees, and their dependents and is managed by the U.S. Defense Health Agency. Under TRICARE, "[a]ny service or supply which is not medically or psychologically necessary to prevent, diagnose, or treat a mental or physical illness, injury, or bodily malfunction . . . may not be provided." 10 U.S.C. § 1079(a)(12).

## V.     DEFENDANTS' WRONGDOING

48.     Dr. Kendrick controls the operations at both MASI clinics and directs all of the fraudulent conduct alleged herein.

### A.  False Billing For Services By An NP Or CNS As If They Were Furnished "Incident To" A Physician's Professional Services

49.     Defendant MASI submitted fraudulent claims to Federal health care programs for

15

office visits and nursing home visits by an NP or CNS[6] as if they were "incident to" a physician's professional services, even though the NP or CNS performed the services alone, without the supervision of a physician. The schedules for the two MASI physicians, Drs. Kendrick and Embry, in whose names MASI submitted the claims, confirm that they were rendering services to patients at other locations when the NPs and CNSs performed these patient visits, and thus the physicians were not "immediately available to furnish assistance and direction throughout the performance of the procedure." 42 C.F.R. § 410.32(b)(3)(ii).

50.     Each time MASI used a physician's provider number to submit a claim for a patient visit by an unsupervised NP or CNS, MASI caused Medicare to pay 15 percent more than Medicare would have paid had MASI disclosed that the NP or CNS performed the service alone. *See* 42 C.F.R. § 414.56(c).

51.     Until about October 2021, MASI NPs and CNSs did not have their own login credentials for MASI's electronic medical records ("EMR") system. Prior to that time, NPs and CNSs would log in to the EMR system using Dr. Kendrick's or Dr. Embry's credentials to document patient visits. Once the NPs or CNS finished documenting the visits, the system automatically added the physician's electronic signature to the record. MASI then submitted claims for the services as if physicians had supervised the NPs or CNSs during the patient visits.

       i.     *Underline:* *False billing under Dr. Kendrick's Provider Number*

52.     Dr. Kendrick has treated patients at MASI's Springdale clinic on Mondays and Wednesdays and at the Huntsville clinic on Tuesdays and Thursdays. He has performed

---

[6] NPs and CNSs are types of Advance Practice Registered Nurses ("APRNs"), along with certified nurse-midwives and certified registered nurse anesthetists. At MASI, Marie Hatfield and Gina Dickey are NPs. Tammie Smith is a CNS. MASI's patient medical records list NPs Hatfield and Dickey as APRNs.

surgeries at Washington Regional Hospital in Fayetteville on Fridays. Dr. Kendrick did not travel between locations during the day.

53.     At least on Tuesdays and Thursdays since at least 2017, Dr. Kendrick has sent NPs and CNSs to provide services in nursing homes and assisted living facilities (including Edgewood Health & Rehabilitation Center (also known as Walnut Grove Health & Rehabilitation Center) in Springdale, and Springhouse Village Assisted Living, Fayetteville Health and Rehabilitation Center, and Brookstone Assisted Living Community in Fayetteville) when he was not present in the facilities, but rather was seeing patients at one of MASI's clinics. MASI then submitted claims for the services as if Dr. Kendrick directly supervised the NPs and CNSs during the patient visits, even though Dr. Kendrick was not present in the facilities during the visits.

54.     The following are examples of nursing home and assisted living facility visits performed by MASI NPs that MASI billed incident to Dr. Kendrick's services using his provider number even though he was not at the facilities at the time of the visits:

55.     **Patient 1**.[7] On Monday, October 14, 2019, NP Marie Hatfield saw Patient 1 at Brookstone Assisted Living Community. Patient 1 was a Medicare beneficiary with secondary insurance from Government Employees Health Association, Inc. ("GEHA"), a FEHBP insurer. MASI billed $210 for the visit under Dr. Kendrick's provider number using CPT code 99326, even though Dr. Kendrick's schedule shows that he was seeing patients in the Springdale Clinic that day and could not have been present with NP Hatfield at the assisted living facility when she saw Patient 1. Subsequently, Medicare paid MASI $106.45 for the visit, and GEHA paid $26.70.

56.     **Patient 2**. On Tuesday, October 1, 2019, NP Hatfield saw Patient 2 at Fayetteville

---

[7] For each patient referenced in this complaint by number, Relator has provided, or will provide, the patient's name to the government and will do the same for the Defendants and/or the Court upon request.

Health and Rehabilitation Center. Patient 2 was a Medicare beneficiary with secondary coverage from Arkansas Medicaid.  MASI billed $197 for the visit under Dr. Kendrick's provider number using CPT code 99305 (a new patient visit), even though Dr. Kendrick was at the Huntsville clinic on Tuesdays and could not have been at the nursing home. Subsequently, Medicare paid MASI $99.23 for the visit, and Medicaid paid $24.89.

57.     On Tuesday, October 29, 2019, NP Hatfield saw Patient 2 again at Fayetteville Health and Rehabilitation Center. MASI billed $163 for this visit under Dr. Kendrick's provider number using CPT code 99309, even though Dr. Kendrick was at the Huntsville Clinic on Tuesdays and could not have been present with NP Hatfield at the nursing home when she saw Patient 2. Subsequently, Medicare paid MASI $69.41 for the visit, and Medicaid paid $17.41.

58.     On Thursday, December 5, 2019, NP Hatfield saw Patient 2 again at Fayetteville Health and Rehabilitation Center and administered an injection of methylprednisolone. MASI billed $291 for this visit and the injection procedure (plus an additional amount for the drug) under Dr. Kendrick's provider number using CPT codes 99309 and 20610, even though Dr. Kendrick was at the Huntsville Clinic on Thursdays and could not have been present with NP Hatfield at the nursing home when she saw Patient 2. Subsequently, Medicare paid MASI $104.37 for the visit and the injection procedure (not including the cost of the drug), and Medicaid paid $30.95.

59.     **Patient 3**. On Thursday, December 5, 2019, NP Hatfield saw Patient 3 at Walnut Grove Health and Rehab. MASI billed $163 for this visit under Dr. Kendrick's provider number using CPT code 99309, even though Dr. Kendrick was at the Huntsville Clinic on Thursdays and could not have been present with NP Hatfield at the nursing home when she saw Patient 3. Subsequently, Medicare paid MASI $69.41 for this visit.

60.     **Patient 4**. On Thursday, February 13, 2020, NP Hatfield saw Patient 4 at

18

Fayetteville Health and Rehabilitation Center. MASI billed $197 for this visit under Dr. Kendrick's provider number using CPT code 99305 (a new patient visit), even though Dr. Kendrick was at the Huntsville Clinic on Thursdays and could not have been present with NP Hatfield at the nursing home when she saw Patient 4. Subsequently, Medicaid paid MASI $123.53 for this visit.

      *ii.*   *False billing under Dr. Embry's Provider Number*

61.     Dr. Embry did not work on Mondays. He treated patients at the Huntsville Clinic on Tuesdays, Wednesdays, and Fridays. He saw patients in nursing homes on Thursdays. Dr. Embry did not travel between locations during the day.

62.     The following are examples of patient visits by MASI NPs that Defendants billed incident to Dr. Embry's services using his provider number on days when he was not in the clinic or at a nursing home, and could not have seen the patients or supervised the visits:

63.     **Patient 5**. On Tuesday, February 25, 2020, NP Hatfield saw Patient 5 at Springhouse Village. MASI billed $203 for this visit under Dr. Embry's provider number using CPT code 99336, even though Dr. Embry's schedule shows that he was seeing patients at the Huntsville Clinic that day and could not have been present with NP Hatfield at the nursing home when she saw Patient 5. Subsequently, Medicare and Medipak, a Medicare supplement plan, paid MASI a total of $128.74 for this visit.

64.     **Patient 6**. On Monday, March 30, 2020, and Thursday, April 30, 2020, NP Gina Dickey saw Patient 6 for office visits. MASI billed $161.00 for each of these visits under Dr. Embry's provider number using CPT code 99214 with modifier AQ (which applies to services provided in a Health Professional Shortage Area), even though Dr. Embry was not in the office during either visit. Indeed, Dr. Embry's schedule did not list any office visit appointments on either of these dates. Medicare paid MASI $79.30 for each of these visits by NP Dickey.

19

65.    **Patient 7**. On Monday, February 3, 2020, NP Dickey saw Patient 7 for an office visit. MASI billed $250 for this visit under Dr. Embry's provider number using CPT code 99204 (a new patient office visit), even though Dr. Embry was not in the office during the visit. Dr. Embry's schedule does not list any office visit appointments on February 3, 2020. Arkansas Medicaid paid MASI $88.00 for this visit.

66.    **Patient 8**. On Monday, January 27, 2020, NP Dickey saw Patient 8 for an office visit. MASI billed $168 for this visit under Dr. Embry's provider number using CPT code 99203 (a new patient office visit), even though Dr. Embry was not in the office during the visit. Dr. Embry's schedule does not list any office visit appointments on January 27, 2020. Arkansas Medicaid paid MASI $64.90 for this visit.

67.    **Patient 9**. On Thursday, July 11, 2019, NP Dickey saw Patient 9 for an office visit. MASI billed $161 for this visit under Dr. Embry's provider number using CPT code 99214, even though Dr. Embry was not in the office during the visit. Dr. Embry's schedule does not list any office visit appointments on July 11, 2019. Arkansas Medicaid paid MASI $70.05 for this visit.

**B.  False Billing For Dr. Embry Assisting Dr. Kendrick In Surgeries**

68.    Dr. Kendrick performed procedures and minimal surgeries at the two MASI clinics, and he performed more complex surgeries at the Washington Regional Medical Center Hospital in Fayetteville on Fridays. MASI billed for the provider services associated with the procedures and surgeries in the clinics as well as the surgeries in the hospital.

69.    MASI's patient records show that, during some of the surgeries Dr. Kendrick performed at the hospital, NP Hatfield assisted. For other surgeries Dr. Kendrick performed, the records do not show that anybody from MASI assisted. Nonetheless, for both the surgeries Dr. Kendrick performed with NP Hatfield's assistance and surgeries he performed without

assistance from any MASI provider, MASI billed for the provider services associated with the surgeries as if Dr. Embry had assisted. Specifically, MASI billed for the procedures using modifier "82" and Dr. Embry's provider number to represent that Dr. Embry had assisted.

70.    Dr. Embry's office schedule shows that he was working at the Huntsville Clinic on Fridays, or was on vacation, and could not have assisted Dr. Kendrick at the hospital during the surgeries.

71.    When NP Hatfield assisted in a surgery, MASI should have billed the procedure under NP Hatfield's provider number using modifier "AS". By fraudulently billing under Dr. Embry's provider number using modifier "82," MASI received an extra 15% in reimbursement.

72.    When nobody from MASI assisted Dr. Kendrick in a surgery, MASI should not have billed for an assistant.

73.    The following are examples of surgeries Dr. Kendrick performed at Washington Regional Medical Center where MASI billed as if Dr. Embry had assisted when, in reality, nobody from MASI assisted or NP Hatfield assisted:

74.    **Patient 10**. Dr. Kendrick performed a surgery on Patient 10 on Friday, April 21, 2017. The surgery Operative Report listed NP Hatfield as having assisted. Nonetheless, MASI billed $1,600 for NP Hatfield's assistance under Dr. Embry's provider number, using CPT code 27880 (Amputation Procedures on the Leg (Tibia and Fibula) and Ankle Joint) and modifier 82. Medicare and Medicaid paid MASI $138.21 on this claim.

75.    **Patient 11**. Dr. Kendrick performed a surgery on Patient 11 on Friday, March 17, 2017. The surgery Operative Report listed NP Hatfield as having assisted. Nonetheless, MASI billed $1,500 for NP Hatfield's assistance under Dr. Embry's provider number, using CPT code

47563 (Laparoscopic Procedures on the Biliary Tract) and modifier 82. Medicare and AARP Healthcare Options, a Medicare supplement plan, paid MASI a total of $106.92 on this claim.

76.     **Patient 12**. Dr. Kendrick performed a surgery on Patient 12 on Friday, June 21, 2019. The surgery Operative Report listed NP Hatfield as having assisted. Nonetheless, MASI billed $2,200 for NP Hatfield's assistance under Dr. Embry's provider number, using CPT code 44050 (Incision Procedures on the Intestines) with modifier 82, as well as CPT code 38570 (Other Procedures on the Stomach) with modifiers 82 and 59 (to indicate distinct and independent surgical services on the same day). Medicare and Medipak paid MASI a total of $374.83 on this claim.

77.     **Patient 13**. Dr. Kendrick performed a surgery on Patient 13 on Friday, July 5, 2019. The surgery Operative Report did not list an assistant, and Dr. Embry's schedule shows that he was on vacation from July 2 to July 14, 2019. Nonetheless, MASI billed $2,100 for assistance during the surgery using Dr. Embry's provider number and CPT codes 49566 (rerepair ventral hernia block) with modifier 82 and 49568 (hernia repair w/ mesh) with modifier 82. Medicare paid MASI $146.14 on this claim.

78.     **Patient 14**. Dr. Kendrick performed a surgery on Patient 14 on Wednesday, April 11, 2018. The surgery Operative Report did not list an assistant, and Dr. Embry's schedule shows that he was at the Huntsville Clinic seeing patients during the time of this surgery and could not have assisted in the surgery. Nonetheless, MASI billed $1,500 for assistance during the surgery using Dr. Embry's  provider number and CPT code 47563 (Laparoscopic Procedures on the Biliary Tract) with modifier 82. Medicare and Blue Cross Blue Shield of Arkansas paid MASI a total of $107.69 on this claim.

79.     **Patient 15**. Dr. Kendrick performed a surgery on Patient 15 on Friday, September 6, 2019. The surgery Operative Report did not list an assistant, and Dr. Embry's schedule shows

that he was at the Huntsville Clinic seeing patients during the time of this surgery and could not have assisted in the surgery. Nonetheless, MASI billed $1,500 for assistance during the surgery using Dr. Embry's provider number and CPT code 47563 (Laparoscopic Procedures on the Biliary Tract) with modifier 82. Medicare and Medicaid paid MASI a total of $108.14 on this claim.

80.     **Patient 16**. Dr. Kendrick performed a surgery on Patient 16 on Friday, March 8, 2019. Dr. Embry's schedule shows that he was at the Huntsville Clinic seeing patients during the time of this surgery and could not have assisted in the surgery. Nonetheless, MASI billed $1,500 for assistance during the surgery using Dr. Embry's provider number and CPT code 47563 (Laparoscopic Procedures on the Biliary Tract) with modifier 82. Medicare and Medicaid paid MASI a total of $108.14 on this claim.

## C. False Billing For Non-Substantive Phone Calls Between Patients And MASI LPNs And RNs

81.     In March 2020, in reaction to the Covid-19 pandemic, MASI began performing certain appointments over the phone, but MASI then submitted fraudulent claims for remote patient encounters performed by an LPN, RN, or medical assistant. As noted above, the law permits billing for a level 1 visit (*e.g.*, using CPT code 99211) conducted by a nurse if the visit does "not require the presence of a physician or other qualified health care professional," but MASI billed these remote encounters as level 3 telehealth visits (*e.g.*, using CPT code 99213 with modifier 95 to denote a telehealth visit), even when the purpose of the encounter was simply to approve medication refills via fax. Dr. Kendrick instructed staff to code the visits this way even when no physician, NP, or CNS spoke to the patient or was present during the encounter. Even if a MASI physician, NP, or CNS had performed these brief encounters for medication refills, the encounters did not warrant billing as level 3 or a level 4 office visits, which must involve a review and examination of body systems.

23

82.     In April 2020, Relator received a call from a patient who had just had an office visit with NP Hatfield. The patient called to ask NP Hatfield to refill another medication that the patient had forgotten to mention during the office visit. Relator briefed NP Hatfield on the patient call. NP Hatfield instructed Relator to bill another televisit for the medication refill. Relator told NP Hatfield that billing this simple patient phone call as a televisit was improper. NP Hatfield reported Relator to Dr. Kendrick, who then reported Relator to Mary White, Relator's supervisor. Ms. White called Relator and explained that Dr. Kendrick's instructions were to bill a telehealth visit under such circumstances. When Relator tried to explain that this was improper, Ms. White responded, "no one cares about your opinion," and instructed Relator just to do as she was told.

83.     Like Relator, NP Dickey and LPNs Linsey Sims and Jennifer Cline expressed reluctance to coding medication refill phone calls with patients as level 3 office visits. In response to this pushback, on June 18, 2020, Defendants issued an instruction sheet with the following mandates for billing "televisit[s]":

> ALL OF THESE REQUIRE A TELEVISIT NO EXCEPTIONS
> 1. ALL Medication Prior Authorizations.
> 2. New medications, such as antibiotic or other chronic medication.
> 3. Medication refills requests via phone, fax, or ERX. Unless they are a monthly patient, that has current lab or recent notes.
> 4. Any abnormal lab notification. Note in the televisit the education and medication changes done.
> 5. These need to be coded as a level 3 and note televisit on the charge sheet along with the appropriate diagnosis(s) related to the visit.
> 6. The only exception to this rule will be Medicaid. If the patient has chronic health problems, then we will not do a televisit. If it someone that only comes in once or twice a year, do a televisit.

(Capitalization in original.)

84.     Dr. Kendrick signed this instruction sheet.

85.     The following are examples of non-substantive phone calls between patients and MASI LPNs and RNs that MASI billed as Level 3 or Level 4 telehealth visits:

24

86.   **Patient 17**. On April 2, 2020, MASI received a medication refill request from a pharmacy for Patient 17, a Medicare beneficiary. A MASI LPN, Natasha Ennis, then spoke with the patient and signed her initials next to the chief complaint in the visit notes. Although the patient record does not reflect that a MASI physician, NP, or CNS spoke with Patient 17 during this encounter, MASI billed $111 for the encounter using Dr. Kendrick's provider number and CPT code 99213 with modifier 95. Subsequently, Medicare paid MASI $38.99 for the encounter.

87.   **Patient 18**. On April 2, 2020, LPN Ennis spoke to Patient 18, a Medicare beneficiary, about a medication refill, and Ms. Ennis signed her initials next to the chief complaint in the visit notes. Although the patient record does not reflect that a MASI physician, NP, or CNS spoke with Patient 18 during this encounter, MASI billed $111 for the encounter using Dr. Kendrick's provider number and CPT code 99213 with modifiers 95 and AQ (service performed in a Health Professional Shortage Area.). Subsequently, Medicare paid MASI $38.99 for the encounter.

88.   **Patient 19**. On April 2, 2020, LPN Ennis spoke to Patient 19, a Medicare and Arkansas Medicaid beneficiary, about a medication refill, and Ms. Ennis signed her initials next to the chief complaint in the visit notes. Although the patient record does not reflect that a MASI physician, NP, or CNS spoke with Patient 19 during this encounter, MASI billed $161 for the encounter using Dr. Kendrick's provider number and CPT code 99214 with modifiers 95 and AQ. Subsequently, Medicare paid MASI $60.12 and Medicaid paid $15.08 for the encounter.

89.   **Patient 20**. On May 7, 2020, a MASI RN, Kim Main, spoke to Patient 20, a United Healthcare Medicare Advantage policyholder, about lab results. Although the patient record does not reflect that a MASI physician, NP, or CNS spoke with Patient 20 during this encounter, MASI billed $111 for the encounter using Dr. Kendrick's provider number and CPT codes 99213 with

modifier 95 and 85025 (Hematology and Coagulation Procedures). Subsequently, United Healthcare paid MASI $48.91 for the encounter.

### D.  False Billing For Both A Scheduled Procedure And A Related Office Visit

90.     When MASI providers saw patients for a scheduled procedure and a related office visit on the same day, MASI fraudulently billed Federal health care programs for both, even though the law permits billing for an office visit on the day of a procedure only when the office visit involves a "significant, separately identifiable evaluation and management service." For example, when patients came in for a colonoscopy or wound care by Dr. Kendrick, MASI routinely billed for the procedure and an office visit, even though Dr. Kendrick did not perform additional, separately identifiable services during these scheduled procedures.

91.     The following are examples of instances where MASI wrongfully billed for an office visit on the same day as a procedure:

92.     **Patient 21**. Patient 21, a United Healthcare Medicare Advantage policyholder, visited Dr. Kendrick for routine, pre-scheduled wound debridement procedures over a period of at least six months, and MASI regularly billed for both the wound procedure and an office visit after each of these patient encounters. Among these encounters were the following:

      a.     On October 3, 2019, MASI billed for wound debridement and strapping procedures (CPT codes 11042 and 29581) with modifier 59 *and* billed $111 for a level 3 office visit (CPT code 99213) with modifier 25 representing that the office visit involved "a significant, separately identifiable evaluation and management service," even though Dr. Kendrick performed no such service. United Healthcare paid MASI $68.03 for this purported office visit.

b.  On February 27, 2020, MASI billed for a wound debridement procedure (CPT code 11042) with modifier 59 *and* billed $111 for a level 3 office visit (CPT code 99213) with modifier 25 representing that the office visit involved "a significant, separately identifiable evaluation and management service," even though Dr. Kendrick performed no such service. United Healthcare paid MASI $67.16 for this purported office visit.

c.  On March 26, 2020, MASI billed for wound debridement and strapping procedures (CPT codes 11042 and 29581) with modifier 59 *and* billed $111 for a level 3 office visit (CPT code 99213) with a modifier 25 representing that the office visit involved "a significant, separately identifiable evaluation and management service," even though Dr. Kendrick performed no such service. United Healthcare paid MASI $67.16 for this purported office visit.

93.  **Patient 22**. On January 23, 2020, Dr. Kendrick performed a colonoscopy on Patient 22, a Medicare beneficiary. MASI billed for the colonoscopy (CPT code 45385) with modifier AQ *and* billed $250 for a level 4 new patient office visit (CPT code 99204) with a modifier 25 representing that the office visit involved "a significant, separately identifiable evaluation and management service," even though Dr. Kendrick performed no such service. Medicare paid MASI $122.15 for this purported office visit.

94.  **Patient 23**. On June 26, 2019, Dr. Kendrick administered a second dose of Gelsyn-3 injections to the knees of Patient 23, a Medicare beneficiary. MASI billed for the injections (CPT code 20611) with modifier 50 *and* billed $111 for a level 3 office visit (CPT code 99213) with a modifier 25 representing that the office visit involved "a significant, separately

identifiable evaluation and management service," even though Dr. Kendrick performed no such service. Medicare and United National Life Insurance paid MASI a total of $930.14 for both the procedure and the purported office visit.

**E.  False Billing For Ultrasound-Guided Knee Injections**

95.     Dr. Kendrick performed procedures involving injection of Gelsyn-3 into his patients' knees. On a few occasions prior to 2015 or 2016, Dr. Kendrick used ultrasound to guide the injections, but subsequently he did not use ultrasound to guide the injections. Nonetheless, after Dr. Kendrick stopped using ultrasound to guide the injections, MASI continued to bill Federal health care programs using CPT code 20611 (injection with ultrasound guidance, with permanent recording and reporting) instead of using CPT code 20610 (injection without ultrasound), which would have yielded a lower reimbursement rate.

96.     Relator learned that MASI was wrongfully billing for ultrasound-guided injections while handling a claim denial from United Healthcare in or about November 2018 for Patient 24, a Medicare Advantage patient. United Healthcare denied the claim MASI had billed for Patient 24 using CPT code 20611 because the "records do not support services billed." In response to the denial, Dr. Kendrick initially modified the visit notes by adding an addendum stating that he had performed bilateral knee injections using ultrasound guidance. MASI then sent the updated records to United Healthcare, but the carrier again denied the claim and asked MASI to provide ultrasound images to verify that Defendants had performed an ultrasound-guided injection on Patient 24. At the instruction of Dr. Kendrick, Relator then asked MASI's ultrasound technician, Amber Laue, for the ultrasound images for Patient 24. Ms. Laue responded that the ultrasound images did not exist. Ms. Laue explained that Dr. Kendrick had performed ultrasound-guided injections on the first few patients he treated with Gelsyn-3 but had stopped using ultrasound guidance during these

28

injections two or three years prior to United Healthcare's inquiry.

97.    Relator informed Ms. Laue that United Healthcare would deny the claim for the injection of Patient 24 absent proof that Dr. Kendrick used ultrasound guidance while performing the procedure. Ms. Laue said that she would discuss the issue with Dr. Kendrick.

98.    A few days later, Ms. Laue handed Relator two ultrasound images and informed Relator that Dr. Kendrick's instructions were to place a sticker with the patient's name on the images and send the images to United Healthcare as proof that he had used ultrasound guidance. Relator refused to comply with these instructions because the images she received from Ms. Laue were not images of Patient 24's knees. Nonetheless, at the direction of Dr. Kendrick, Ms. Laue placed the sticker with Patient 24's name on the ultrasound images, and MASI then sent the images to United Healthcare to justify having billed for the procedure using CPT code 20611.

99.    A real ultrasound image contains the patient's name and identification number imprinted on the image. The images Ms. Laue handed to Relator did not have an imprint of the patient's name or identification number. Instead, these images stated 000000000 and 1234567 where the patient's identification number was usually shown. The two ultrasound images that Ms. Laue handed to Relator are included below. The white boxes cover the sticker with the patient's name, identification number, and date of service.





100.    Relator also discussed her concerns with Theresa Farrar, a coder/biller at the Springdale clinic. Relator told Ms. Farrar that sending fake ultrasound images to payors was wrongful. Ms. Farrar initially agreed with Relator.

101.    When Relator refused to bill for ultrasound-guided injections that did not actually involve the use of ultrasound, Dr. Kendrick responded: "Bring it to Theresa, she'll do it." Dr. Kendrick also told Relator to go home without pay if she did not comply with his mandate regarding billing for ultrasounds.

102.    Relator brought future claims for ultrasound-guided injections to Ms. Farrar to bill.

103.    The following are examples of instances when MASI billed for ultrasound-guided injections by Dr. Kendrick even though Dr. Kendrick did not use ultrasound guidance during the procedures:

104.    **Patient 25**. Dr. Kendrick performed Gelsyn-3 injections on the knees of Patient 25, a Medicare beneficiary, on January 16 and 23, 2020. Each time, MASI billed $340.00 using CPT code 20611, even though Dr. Kendrick did not use ultrasound guidance during either procedure. Medicare paid $104.14 for each injection.

105.    **Patient 26**. Dr. Kendrick performed Gelsyn-3 injections on the knees of Patient 26 a Medicare beneficiary, on January 16 and 23, 2020. Each time, MASI billed $340.00 using CPT code 20611, even though Dr. Kendrick did not use ultrasound guidance during either procedure. Medicare paid MASI $104.14 for each procedure.

106.    **Patient 27**. Dr. Kendrick performed Gelsyn-3 injections on the knees of Patient 27, a Medicare and TRICARE beneficiary, on May 10, 17, and 24, 2018. Each time, MASI billed $340.00 using CPT code 20611, even though Dr. Kendrick did not use ultrasound guidance during the procedures.

107.     Dr. Kendrick performed Gelsyn-3 injections on the knees of Patient 27 again on August 8, 15, and 22, 2019. Each time, MASI billed $340.00 using CPT code 20611 even though Dr. Kendrick did not use ultrasound guidance during the procedures.

108.     **Patient 28**. Dr. Kendrick performed Gelsyn-3 injections on the knees of Patient 28, a Medicare and Manhattan Life Insurance beneficiary, on May 15 and 23, 2019, and on June 11, 2019. MASI billed $340 on May 15 and 23 and $170 on June 11, using CPT code 20611 each time even though Dr. Kendrick did not use ultrasound guidance during any of the procedures.

109.     **Patient 29**. Dr. Kendrick performed Gelsyn-3 injections on the knees of Patient 29, a Medicare and Blue Cross Blue Shield of Arkansas beneficiary, on June 12, 19, and 26, 2018. Each time, MASI billed $340 using CPT code 20611, even though Dr. Kendrick did not use ultrasound guidance during any of the procedures.

**F. Double Billing For Medication Refill Office Visits**

110.     In or about January 2021, MASI began double-billing for certain medication refill office visits. On Tuesdays and Thursdays, Dr. Kendrick treated patients at the Huntsville clinic. NP Dickey also treated patients at the Huntsville clinic on those days. Some MASI patients needed refills of both pain medication and anxiety medication. When one of these visits occurred, MASI created two separate visit notes and billed for two separate visits - one pain management office visit under Dr. Kendrick's provider number and a separate anxiety treatment office visit under Dr. Embry's provider number. Dr. Embry performed nursing home visits on Thursdays and was not in the clinic at all when these office visits occurred. Dr. Kendrick or NP Dickey saw the patient for one visit, but MASI wrongfully billed for two office visits, one under each physician's provider number.

### G. Billing Office Visits For Covid-19 tests

111.     MASI billed for office visits when patients visited MASI clinics only for a Covid-19 test. MASI laboratory technicians swabbed the patients in the MASI clinics' parking lots and did not take vitals or perform a review of systems or examination of the patients. Nevertheless, along with each Covid-19 test, the laboratory technicians documented an office visit in MASI's EMR system. If the patient was an established patient, the laboratory technicians copied the visit notes from past visits over and changed the chief complaint to "Covid test." If the patient was a new patient, the documentation was brief; MASI staff would document that the patient had, for example, a "cough" and needed a Covid-19 test. Dr. Kendrick instructed staff to code a level 3 telehealth visit for these Covid-19 tests. Furthermore, if the patient received a PCR test, MASI billed one office visit for the day of the test and another office visit when MASI's nurses contacted the patient to communicate the results of the PCR test. Billing an office visit for a Covid-19 test was fraudulent because the patients did not see a MASI physician, NP, or CNS, and, in any event, the laboratory technicians did not render any services that would meet the requirements for billing an office visit.

### H. Billing For Existing Patients Office Visits As If They Were New Patient Office Visits

112.     As mentioned above, MASI's NPs and CNSs did not have their own login credentials for MASI's EMR system until late 2021. As a result, the NPs and CNSs documented office visits by logging into the EMR system using the credentials of a MASI physician and billed their visits incident to the physician's services. In or about October 2021, after Relator initiated this action and presumably after the government contacted Defendants to investigate Relator's allegations, MASI issued login credentials to its NPs and CNSs to allow them to document their own office visits and bill under their own provider numbers. MASI instructed the NPs and CNSs

to bill their next visits with existing MASI patients as new patient visits, which, as noted above, generate higher reimbursement than existing patient visits. Because MASI had billed all prior visits with these patients under a physician's or MASI's provider number, payors would not associate the provider numbers of the NPs and CNSs with the existing patients and would not know that the same providers had treated these patients previously.

113.    Relator refused to bill existing patient visits as new patient visits. When Ms. Farrar noticed that Relator had been billing existing Medicaid patients as established patient visits, she asked Relator to issue corrected claims and bill these visits as new patient visits. Relator refused. Ms. White then called Relator and instructed her to bill these visits as new patient visits under the provider number of the NP or CNS. Ms. White also told Relator that she would be losing the company a lot of money if she refused to comply with these instructions.

## I.    Retroactively Falsifying Medical Records To Match The False Bills Defendants Submitted to Payors

114.    In May 2021, MASI received a request for records from Ciox, a third-party company commissioned by insurance companies to conduct reviews of records. Relator learned from multiple co-workers that Dr. Kendrick falsified medical records that MASI submitted in response to this request. Specifically, Dr. Kendrick altered patient medical records to conform to information shown on bills that MASI previously had submitted. For example, if Ciox inquired about a visit that MASI had billed under a MASI physician's provider number, but the visit notes showed that a MASI NP treated the patient, Dr. Kendrick changed the visit notes to show that a MASI physician treated the patient.

115.    Before MASI produced any medical records, Dr. Kendrick asked Ms. Farrar or Ms. White to print the medical record and the bill. Dr. Kendrick then compared the two documents. If they contained conflicting information, Dr. Kendrick logged into the EMR system and falsified

the medical record to match the bill before MASI mailed the record.

116.    Marissa Crabtree, front desk receptionist at the Huntsville clinic, told Relator that Mary White had instructed Ms. Crabtree to route requests for medical records to the Springdale clinic so that Dr. Kendrick could review the medical records and the billing records and then, if necessary, alter the medical records to match the bills. While Relator was working from home in May 2021, Ms. Crabtree called Relator to make sure Relator knew not to send out any medical records before Dr. Kendrick had a chance to change the records to match the bills MASI previously had submitted.

117.    Similarly, on June 22, 2021, a day after Relator had returned to working in the office, Ms. Farrar reminded Relator not to send out any medical records before Dr. Kendrick had a chance to change them.

118.    Around July 13 or 14, 2021, LPN Sims, who worked under Dr. Embry, told Relator, LPN Cline, and Ms. Crabtree that Dr. Kendrick was altering medical records, that she was tired of this fraud, and that she felt like calling the FBI. LPN Sims described a phone call she had witnessed between Drs. Kendrick and Embry, during which Dr. Embry told Dr. Kendrick that he would no longer collaborate with MASI NPs/CNSs or allow that their visits be billed incident to his services. Dr. Embry threatened to report Dr. Kendrick to the Arkansas State Medical Board if this type of billing continued. Ms. Sims stated that Dr. Embry had informed the Medical Board that he would no longer collaborate with MASI NPs and CNSs.

119.    On July 27 or 29, 2021, a MASI LPN, Natasha Ennis, reminded Relator not to send out medical records before Dr. Kendrick had a chance to change the medical records to match the bills.

120.    On September 15, 2021, LPN Cline told Relator that Ms. White had instructed her

35

to alter NP Dickey's patient charts that had been billed incident to the services of a MASI physician. Ms. White instructed LPN Cline to create new visit notes under another MASI physician's name. LPN Cline was initially reluctant, but NP Dickey pressured her to alter the records and LPN Cline complied.

121.    On September 21, 2021, Ms. Farrar told Relator that Dr. Kendrick instructed MASI's NPs to stop entering their names in medical records as the treating providers. Ms. Farrar explained that the medical records would show the name of a physician as the treating provider so that the medical records did not have to be altered later to match the bills, which falsely stated that a physician treated the patients.

## VI.    CAUSES OF ACTION

### COUNT I: FALSE OR FRAUDULENT CLAIMS
### 31 U.S.C. § 3729(a)(1)(A)

122.    Relator re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

123.    Defendants knowingly presented or caused to be presented to Federal health care programs false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A). Specifically, Defendants presented or caused to be presented claims for payment to Federal health care programs for services that did not occur as Defendants reported them to have occurred and/or services that were unreasonable, unnecessary, or unwarranted, as described herein.

124.    By virtue of the false or fraudulent claims Defendants knowingly presented or caused to be presented, the United States has suffered actual damages in an amount to be proven at trial. The United States is entitled to recover treble damages plus a civil monetary penalty for each and every false claim.

## COUNT II: FALSE STATEMENTS MATERIAL TO FALSE CLAIMS
### 31 U.S.C. § 3729(a)(1)(B)

125.    Relator re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

126.    Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to Federal health care programs, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B). These false records and statements included false and misleading representations on claim forms submitted to Federal health care programs regarding (1) the identity of the person providing the services, and (2) the level or type of services provided.

127.    By virtue of the false records or statements Defendants made, used or caused to be made or used, the United States has suffered actual damages in an amount to be proven at trial. The United States is entitled to recover treble damages plus a civil monetary penalty for each and every false claim.

## COUNT III: REVERSE FALSE CLAIMS ACT
### 31  U.S.C. § 3729(a)(1)(G)

128.    Relator re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

129.    During the period 2018 to the present day, Defendants knowingly made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G). Specifically, Defendants ignored Relator's repeated concerns, dating back to 2018, that Defendants were wrongfully billing Federal health care programs for

services provided by MASI clinicians, as described herein. Defendants knew or should have known that they had received monies from Federal health care programs to which they were not entitled as a result of this false billing. Nevertheless, Defendants did not return these overpayments and continued to bill falsely for the services.

130.    By virtue of Defendants' conduct, the United States has suffered actual damages in an amount to be proven at trial. The United States is entitled to recover treble damages plus a civil monetary penalty for each and every false claim.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Relator prays that judgment be entered in favor of the United States and Relator as follows:

1.    On Counts I, II, and III, that judgment be entered against Defendants, jointly and severally, and in favor of the United States for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

2.    An award to Relator of a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730;

3.    An award to Relator of her costs and reasonable attorneys' fees and costs for prosecuting this action; and

4.    All other relief as may be required or authorized by law in the interest of justice.

## VIII.   JURY DEMAND

Relator, on behalf of herself and the United States, hereby demands a jury trial on all

issues triable to a jury.


Dated:  March 7, 2022                                    /s/ Jeffrey A. Newman
                                                                    Jeffrey A. Newman (*pro hac vice*)
                                                                    Gregg Shapiro (*pro hac vice* to be filed)
                                                                    Massachusetts BBO # 370450
                                                                    Newman & Shapiro
                                                                    One Story Terrace
                                                                    Marblehead MA 01945
                                                                    Phone: 978-880-4758
                                                                    Fax: 781-639-8688
                                                                    jnewman@newmanshapiro.com
                                                                    gshapiro@newmanshapiro.com

                                                                    Cory S. Fein (*pro hac vice* to be filed)
                                                                    Cory Fein Law Firm
                                                                    712 Main St., Suite 800
                                                                    Houston, TX  77002
                                                                    Phone: 281-254-7717
                                                                    Fax: 530-748-0601
                                                                    cory@coryfeinlaw.com

                                                                    Daniel Ford
                                                                    Sanford Law Firm, PLLC
                                                                    650 S. Shackleford Rd., Suite 411
                                                                    Little Rock AR 72211
                                                                    800-615-4946 (Main)
                                                                    501-904-1653 (Direct)
                                                                    daniel@sanfordlawfirm.com

                                                                    ATTORNEYS FOR RELATOR


## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of March, 2022, I filed the foregoing using the Court's
CM/ECF system, resulting in service on the attorneys of record. Relator's counsel conferred with
Assistant United States Attorney Candace Taylor, representing the interests of the United States,
before filing this First Amended Complaint.

                                                                    /s/ Jeffrey A. Newman
                                                                    Jeffrey A. Newman